**PENSION BENEFIT GUARANTY CORPORATION, Appellant,**

v.

**WHITE CONSOLIDATED INDUSTRIES, INC., c/o CT Corporation Systems Registered Agent.**

No. 92–3676.

United States Court of Appeals, Third Circuit.

Argued May 3, 1993.

Decided June 30, 1993.

---

George R. Clark, Reed, Smith, Shaw & McClay, Nancy S. Heermans (Argued), Pen-sion Ben. Guar. Corp., Washington, DC, for appellant.

Robert S. Garrett, Egler, Garrett & Egler, Pittsburgh, PA, William G. McGuinness, Alexander R. Sussman (Argued), Fried, Frank, Harris, Shriver & Jacobson, New York City, for appellee.

Before COWEN, ROTH and ROSENN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

White Consolidated Industries, Inc. ("WCI") sold a group of unprofitable businesses and their associated underfunded pension plans to a newly .formed corporation. WCI, however, remained contractually obligated to make substantial contributions to the plans for five additional years. More than six years after the stated closing date of this sale, the largest of these pension plans terminated. The Pension Benefit Guaranty Corporation ("PBGC"), which is obligated to pay the guaranteed benefits of this plan to the beneficiaries, seeks to recover for these unfunded obligations from WCI, the predecessor employer.

The district court dismissed the PBGC's amended complaint in its entirety. We hold that the PBGC has stated a legally sufficient claim under 29 U.S.C. § 1369 (1988). Section 1369's requirement that a transaction "become[ ] effective" within five years of the plan termination is met because a transaction does not take effect until the previous plan sponsor stops making substantial payments to the pension plans. On the other hand, because section 1369 specifically addresses predecessor liability and applies to this transaction, we will not read an unexpressed predecessor liability rule into 29 U.S.C. § 1362 (1988). Additionally, the PBGC's claim that the transaction at issue is a sham also survives the motion to dismiss. We therefore will affirm in part and reverse in part the order of the district court, and remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

On September 27, 1985, WCI sold a group of unprofitable businesses and nine associated underfunded pension plans to the newly formed Blaw Knox Corporation. On September 26, 1991, six years later, the PBGC filed a complaint against WCI seeking a declaration that WCI would be liable under 29 U.S.C. §§ 1362, 1369 for the transferred plans' unfunded benefit liabilities if and when they terminated. The PBGC amended its complaint after the largest Blaw Knox pension plan terminated. The amended complaint alleges the following facts, which we accept as true for purposes of this motion to dismiss. See Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir.1993).

WCI is primarily a manufacturer of home appliances. In 1981, WCI owned several unrelated businesses that manufactured steel rolls, metal castings and other industrial equipment (collectively "steel businesses"). The steel businesses had been incurring substantial operating losses for several years and their pension plans were grossly under-funded. WCI unsuccessfully attempted to sell these operations for several years. In 1984, WCI established a $94 million reserve for disposing of its steel businesses. A significant portion of this reserve corresponded to unfunded pension liability.

Because WCI was unable to sell its steel businesses, it invited the presidents of the businesses' divisions to make offers to purchase their divisions. Several presidents submitted offers with the caveat that WCI retain the associated pension liabilities. WCI rejected these offers.

WCI finally located a buyer willing to assume the pension fund liabilities. On September 27, 1985, WCI sold the steel businesses' assets to a newly formed corporation, Blaw Knox Corporation, which was set up by Cleveland businessman Robert Tomsich. The purchase and sale agreement required Tomsich to contribute one million dollars in unencumbered capital to Blaw Knox.[1] Aside from this one million dollars, which the PBGC alleges was never paid, Blaw Knox

paid no money for the assets of the steel businesses, but merely assumed their liabilities. The only cash exchanged at closing was the $20 million WCI paid Blaw Knox in return for $23 million in accounts receivable WCI retained.

Given Blaw Knox's undercapitalization, the steel businesses' history of operating losses, and the dismal forecasts for the steel industry, WCI knew that Blaw Knox had no reasonable opportunity to meet the pension obligations it assumed. WCI also knew that under amendments to the Employment Retirement Income Security Act ("ERISA") under consideration by Congress, WCI could be liable for the unfunded benefits of the pension plans if the plans terminated within five years of the closing of its deal with Tomsich. Therefore, PBGC alleges that WCI, for the purpose of evading its pension liabilities, structured the transaction to ensure that the Blaw Knox pension plans survived for five years.

To ensure the viability of the plans for five years, the purchase and sale agreement required WCI to contribute four million dollars annually for five years directly to the Blaw Knox pension plans. The contract also required Blaw Knox to pay $1.2 million per year for five years to the plans. In addition, Blaw Knox was contractually obligated to open a $15 million irrevocable letter of credit to indemnify WCI for any liability it might incur relating to the Blaw Knox pension plans, including specifically any claim of the PBGC arising from the termination of these plans. Blaw Knox also agreed to indemnify WCI for pension plan liability incurred in excess of the letter of credit. To support the indemnity agreement, WCI retained a security interest in substantially all of Blaw Knox's assets. Termination of any underfunded Blaw Knox pension plan constituted a default under the security agreement and gave WCI the right to repossess all of the assets securing Blaw Knox's indemnity.

The transaction also protected Tomsich. He received a seventy-eight percent owner-

---

1. The PBGC's complaint did not allege this fact. Because we hold that we may consider the concededly authentic purchase and sale agreement that WCI attached to its motion to dismiss, see infra part II, we include this information in our factual background.

ship interest in Blaw Knox. Some Blaw Knox managers and executives of Nesco, a diversified holding company of which Tomsich was president, owned the remaining shares. Because Tomsich's interest was less than eighty percent, if the plans failed, Tomsich would not be jointly liable with Blaw Knox under ERISA as part of a control group.

WCI's position would have improved no matter what happened. WCI believed that if the plans failed five years after the deal closed, it would not be responsible for termination liability. If WCI was found liable for the termination liability, however, it could foreclose on virtually all the transferred assets and collect from Blaw Knox under the letter of credit.

From 1986 through 1990, WCI made its annual four million dollar contribution to the plans. Blaw Knox was forced to liquidate assets to meet its annual contractually required $1.2 million contribution. In February 1992, seventeen months after WCI's last contribution to the plans, the largest Blaw Knox plan literally ran out of money. The PBGC therefore had to terminate the plan. *See* 29 U.S.C. § 1342(a) (1988 & Supp. III 1991) (PBGC must terminate plan that does not have assets available to pay currently due benefits). The unfunded liabilities of this plan are estimated at $82 million. The PBGC is now paying the guaranteed pension benefits to the beneficiaries of this plan. Blaw Knox has not made the 1991 or 1992 contributions to the other Blaw Knox plans, which are currently underfunded by an estimated $20 million.

WCI filed a motion to dismiss the amended complaint in its entirety for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The district court dismissed all five counts of the PBGC's amended complaint. The PBGC appeals the dismissal of Counts I, III, IV and V.

## II. DISCUSSION

■ To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.

*See* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 299 (2d ed. 1990); *Watterson v. Page,* 987 F.2d 1, 3–4 (1st Cir.1993); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988). WCI, however, asks us to consider the purchase and sale agreement between WCI and Blaw Knox, which it attached to its motion to dismiss. The PBGC's complaint is based on this contract and describes some of its terms, but the PBGC did not attach the purchase and sale agreement as an exhibit to its complaint.

■ We previously left open whether a court may properly consider a concededly authentic document upon which the complaint is based when the defendant attaches such a document to its motion to dismiss. *See Goodwin v. Elkins & Co.,* 730 F.2d 99, 104 n. 9 (3d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984). We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. *See Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Goodwin,* 730 F.2d at 113 (Becker, J., concurring); *cf. Watterson,* 987 F.2d at 4 (court did not consider document plaintiff attached in response to defendant's motion to dismiss). Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied. *See Goodwin,* 730 F.2d at 113 (Becker, J., concurring).

Our decision will not undermine the rationale underlying Rule 12(b)(6)'s requirement that a motion to dismiss be converted to a summary judgment motion if a court considers matters outside the pleadings. The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. *See Cortec,* 949 F.2d at 48. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the

need for a chance to refute evidence is greatly diminished. *See id.*

WCI also attached to its motion to dismiss a copy of its notice to the PBGC of the transfer of plan sponsorship and the PBGC's letter in response, stating that "no further action is necessary." App. at 34. At the time the PBGC received information relating to the sale of the pension plans and the financial strength of the new sponsor, it believed that no further investigation was warranted. WCI asserts that this conclusion undermines the PBGC's current contention that Blaw Knox had no reasonable chance of fulfilling the pension obligations it assumed. WCI argues that we should consider this correspondence on a motion for summary judgment because it is a matter of public record. We disagree.

 Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include criminal case dispositions such as convictions or mistrials, *see Collins v. County of Kendall, Ill.,* 807 F.2d 95, 99 n. 6 (7th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987), letter decisions of government agencies, *see Phillips v. Bureau of Prisons,* 591 F.2d 966, 968 (D.C.Cir.1979), and published reports of administrative bodies, *see Mack v. South Bay Beer Distrib.,* 798 F.2d 1279, 1282 (9th Cir.1986). WCI asserts that the written exchange between it and the PBGC is a public record because the public may obtain access to it through a Freedom of Information Act ("FOIA") request. *See* 5 U.S.C. § 552 (1988); 29 C.F.R. §§ 2603.1—2603.55 (1992). In the cases cited above, the public had unqualified access to all of the documents at issue. In contrast, potential obstacles exist when one seeks to inspect or copy an unpublished PBGC record. First, one must submit a request to the Disclosure Officer describing the information sought. *See* 29 C.F.R. §§ 2603.32—26.03.33. The PBGC may deny the request if it believes the information is not disclosable. *See id.* §§ 2603.37—2603.38. Many categories of information may not be disseminated. *See, e.g., id.* § 2603.18 (trade secrets and confidential information); *id.* § 2603.17 (PBGC internal rules); *id.* § 2603.19 (inter-agency

and intra-agency communications); *id.* § 2603.21 (information compiled for law enforcement purposes). Finally, an applicant may appeal a denial. *See id.* § 2603.39. Because no FOIA request was made, we do not know if the PBGC would classify these documents as confidential or disclosable. We hold that a document is not a public record for purposes of a motion to dismiss solely because it might be subject to disclosure under FOIA. We therefore will not consider the correspondence between WCI and the PBGC for purposes of this motion to dismiss.

 Having decided that we may consider only the purchase and sale agreement in addition to the complaint, we now review the sufficiency of each count of the PBGC's amended complaint. A district court's order dismissing a complaint is subject to plenary review. *See Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 871 (3d Cir.1992). We may affirm the dismissal only if it appears certain the plaintiff can prove no set of facts that would entitle it to relief. *Id.*

## A. *SECTION 1369*

Counts IV and V of the PBGC's amended complaint allege that WCI is liable for the unfunded pension liabilities of the Blaw Knox plans under 29 U.S.C. § 1369(a) (1988). Section 1369(a) provides in relevant part:

> If a principal purpose of any person in entering into any transaction is to evade liability to which such person would be subject under this subtitle *and the transaction becomes effective within five years before the termination date* of the termination on which such liability would be based, then such person and the members of such person's controlled group (determined as of the termination date) shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date.

29 U.S.C. § 1369 (emphasis added). Section 1369 was the first statutory provision in ERISA expressly to impose liability on predecessor plan sponsors for terminated single-employer plans.

The PBGC alleges that the principal purpose of WCI's sale of its steel businesses and their attendant pension plans to Blaw Knox was to evade liability. We must credit this contention for purposes of the motion to dismiss. The basis of WCI's Rule 12(b)(6) motion is that the PBGC has not alleged facts that demonstrate that the challenged transaction became effective within five years prior to the termination of any plan. On September 27, 1985, WCI and Blaw Knox signed a purchase and sale agreement, which stated that "[o]n the CLOSING DATE, BUYER shall adopt and assume each of the ASSUMED PLANS and shall succeed to all rights and obligations of WCI thereunder." App. at 114. Not until February 1992, more than six years later, did the first plan termination occur. The PBGC offers two theories of how the plan terminated within five years of when the transaction became effective.

### 1.

First, Count IV alleges that WCI's evasive transaction did not become effective for purposes of section 1369 until September 1990, when WCI made its last contribution to prop up the plans. To interpret when WCI's transfer of the pension plans became effective, we begin with the statutory language. Section 1369(a) requires courts to analyze intent at the time the parties "enter[ ] into" the challenged transaction. WCI and Blaw Knox clearly entered into this transaction on September 27, 1985, the day the deal closed. In contrast, the relevant five-year period is measured from the time the transaction "becomes effective." 29 U.S.C. § 1369(a). This different terminology within the same statutory section evidences a congressional intent that a transaction need not "become[ ] effective" on the same day it is "enter[ed] into." Thus, a transaction does not necessarily become effective on the date of closing, as WCI argues and the district court held.

■ Section 1369 supplies us only with a negative definition of "becomes effective"—it is not necessarily synonymous with the closing date. The statute does not define the phrase. Therefore, before defining the ambiguous phrase "becomes effective," we must examine the legislative history of section

1369. Statutory language must be analyzed against the background of the statute as a whole and its legislative purpose. *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); *United States v. Prudential Ins. Co.,* 944 F.2d 1149, 1155 (3d Cir.1991).

■ Congress made clear that it enacted section 1369 to prevent employers from avoiding liability by simply transferring underfunded pension plans to undercapitalized companies:

> Legislation is also needed to provide an explicit prophylactic rule to protect the [PBGC's] insurance program from companies that transfer large amounts of unfunded benefits to a weaker company or that otherwise attempt to evade liability for their pension promises.
>
> . . . .
>
> The basic policy of the legislation is to limit the ability of plan sponsors to shift liability for guaranteed benefits onto other PBGC premium payers and to avoid responsibility for the payment of certain nonguaranteed benefits to cases of severe business hardship.

H.R.Rep. No. 99–300, 99th Cong., 2d Sess., at 279 (1985), *reprinted in* 1986 U.S.C.C.A.N. 42, 756, 930; *see also* H.R.Rep. No. 99–241, pt. 2, 99th Cong., 2d Sess., at 56, *reprinted in* 1986 U.S.C.C.A.N. 685, 714 ("The Committee hopes that the existence of this explicit statutory provision will deter shifting of pension obligations to very week (sic) companies.").

Prior to the passage of section 1369, a single federal district court had held a predecessor sponsor liable for plan termination costs under a different ERISA section, 29 U.S.C. § 1362 (1988). *See In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wis. Steel,* 681 F.Supp. 512 (N.D.Ill. 1988). Section 1362 makes employers at the time of plan termination liable for the unfunded plan benefits. In *Harvester,* the court noted that a literal application of section 1362 would permit an employer to avoid liability by simply transferring grossly underfunded pension plans to an insolvent corporation. Even if the plans terminated the very next day, the PBGC would be responsi-

ble for paying vested benefits to the appropriate recipients. The *Harvester* court found that this result, which sanctioned employer abuse of the PBGC insurance system, could not have been intended by Congress. *See id.* at 523–34. It therefore crafted a rule of predecessor liability to fill an unintended loophole in the statute. The court held that a predecessor employer is liable when it transfers a pension plan that later terminates when: (1) the employer intended to evade pension obligations; and (2) the transferee that assumed responsibility for the plan had economically little chance to succeed. *Id.* at 525–27.

By enacting section 1369, Congress codified the *Harvester* predecessor liability rule, *see* H.R.Rep. No. 99–241, pt. 2, *supra*, at 55, 1986 U.S.C.C.A.N. at 714 (section 1369 "incorporates courts decisions under current law"), with one change. The second prong of the *Harvester* test required the plaintiff to prove that the new employer had no reasonable chance of fulfilling the pension obligations it assumed. In its place, Congress substituted the requirement that the plan terminate within five years of the date the transaction became effective. The PBGC argues that Congress intended to broaden the *Harvester* predecessor liability rule. WCI, on the other hand, asserts that Congress enacted section 1369 to delineate a safe harbor for employers.

We think Congress did both. Congress apparently believed that if a plan terminated within five years of being transferred, it was fair to assume that the new employer did not have a reasonable chance of succeeding at the time of the transfer. Congress also believed that if a plan remained viable for five years under a new sponsor, the previous employer should have the benefit of an irrebuttable presumption that the new sponsor had a reasonable chance of fulfilling the pension obligations it assumed. It is reasonable to assume that Congress viewed the amount of time a pension plan survived after a change of sponsorship as reflective of the economic condition of the new sponsor at the

time of the transfer. Using this easily quantifiable surrogate, Congress fashioned a bright-line rule.

If a transferor makes substantial post-sale contributions to a pension plan to ensure its viability for five years, however, the plan's existence after five years does not reflect the transferee's economic stability at the time of the transfer. We cannot believe that Congress meant to insulate an employer from predecessor liability in these circumstances. Sanctioning this type of scheme would undermine the stated objective of section 1369–to prevent companies from transferring underfunded plans to a weaker company in order to evade liability. *See* H.R.Rep. No. 99–241, pt. 2, *supra*, at 32–33, *reprinted in* 1986 U.S.C.C.A.N. at 690–91. Permitting these actions also would frustrate the broader objective of ERISA as a whole. *See id.* at 32, *reprinted in* 1986 U.S.C.C.A.N. at 690 ("The intent of ERISA is that solvent employers pay for the benefits promised to their employees. . . ."); S.Rep. No. 383, 93rd Cong., 2d Sess., at 1155–56, U.S.C.C.A.N. 1974, p. 4639 (employer may not make pension promises with the intent of shifting these obligations to the PBGC).

■ We therefore hold that a transaction does not become effective for purposes of section 1369 until the company that transferred a pension plan no longer makes substantial pension contributions. *See* Securities and Exchange Commission Staff Accounting Bulletin No. 30, 6 Fed.Sec.L.Rep. (CCH) ¶ 74,141 at 64,259–60 (1985) (legal transfer of ownership of a business results in a divestiture for accounting purposes only when "the risks and other incidents of ownership have been transferred to the buyer").[2] Only then is the financial strength of the new employer tested. If the new employer, primarily on its own, is able to sustain the pension plan obligations for five years, then section 1369 immunizes the previous employer from ERISA liability.

---

2. Section 1369 applies "with respect to transactions becoming effective on or after January 1, 1986." Pub.L. No. 99–272 § 11013(b), 100 Stat. 82, 261 (1985). Since we hold that the transaction did not become effective until WCI made the last pension contribution in 1990, section 1369 is applicable to this transaction.

■ We need not define precisely what constitutes substantial contribution by a predecessor employer. In this case, after WCI transferred the pension plans to Blaw Knox, the amended complaint alleges that WCI made annual payments of four million dollars to the plans, while Blaw Knox contributed only $1.2 million annually. This is clearly substantial support from the transferor.[3] Count IV of the PBGC's amended complaint states a claim under 29 U.S.C. § 1369 upon which relief may be granted.

### 2.

■ The PBGC presents a second theory of liability under section 1369. Count V of its amended complaint alleges that each of WCI's post-sale contributions to the Blaw Knox pension plans was a separate transaction to evade liability. Therefore, the PBGC argues, the payments in 1987 and beyond were individual evasive transactions that occurred within five years of the termination date. To support this argument, PBGC emphasizes that section 1369, by its terms, broadly applies to *"any* transaction ... to evade liability.". 29 U.S.C. § 1369 (emphasis added).

We agree that Congress did not intend to limit the types of transactions covered to traditional sales of pension funds to another entity. *See* H.R.Rep. No. 241, pt. 2, *supra,* at 28–29, 1986 U.S.C.C.A.N. at 686 (purpose of section 1369 is "to protect the [PBGC's] insurance program from companies that transfer large amounts of unfunded benefits to a weaker company or *that otherwise attempt to evade liability for their pension promises."*) (emphasis added). We also agree that post-sale plan contributions by a previous employer made to prolong the life of a failing plan just until the expiration of the five-year limit may qualify as an evasive transaction. In this case, however, WCI made the post-sale payments to fulfill previously fixed contractual obligations. These obligations were not contingent on a future event or renegotiated after the sale. Because these payments were part and parcel of the purchase and sale agreement, we see no reason to analyze each payment in isolation. The district court properly dismissed Count V.

### B. *SECTION 1362*

The PBGC's amended complaint alleges that WCI is also liable under 29 U.S.C. § 1362 as the employer on the date of plan termination. Counts I and III present two independent rationales for finding WCI liable under this section. We address each theory in reverse order.

#### 1. *Implied Termination*

■ Count III of the PBGC's complaint premises section 1362 liability on the *Harvester* theory that there is an implied termination of the plan when it is transferred to an undercapitalized entity for the purpose of evading pension obligations. *See supra* part II.A.1. Assuming without deciding that *Harvester* properly fashioned a judicial rule of predecessor liability under section 1362, we hold that this theory cannot apply to transactions to which section 1369 applies, *i.e.,* transactions that become effective after January 1, 1986.

Prior to 1986, section 1362 was the only ERISA provision held to impose liability for termination of single-employer plans. In its pre–1986 form, section 1362 contained no specific language holding unaffiliated predecessor sponsors liable when a plan terminated after a change of sponsorship. Nevertheless, the PBGC took the position, which the *Harvester* court endorsed, that section 1362 could reach predecessor sponsors in certain circumstances. The *Harvester* court crafted a predecessor liability rule pursuant to section 1362 so that an employer could not avoid liability simply by transferring grossly un-

---

**3.** The district court found that "the Agreement was clear on its face that legal responsibility for meeting ERISA obligations was assumed by Blaw Knox on the closing date." App. at 23. Although WCI did not have a statutory obligation to fund the plans after the closing, it had a binding contractual obligation to do so. To the extent that WCI made its contractually required payments, it relieved Blaw Knox of its obligation to meet ERISA's minimum funding requirements. Therefore, WCI certainly did have a legal responsibility, albeit by contract rather than statute, to make contributions to the plans.

de··j̇ .nded pension plans to an insolvent corporation. 681 F.Supp. at 520–24. Because condoning intentional employer abuse of the PBGC insurance system was an absurd result, the *Harvester* court held that Congress could not have intended that this loophole exist. *See id.*

For transactions that become effective after January 1, 1986, like the WCI sale of its steel businesses, Congress itself has closed this loophole. Section 1369 articulates a predecessor liability rule with specific requirements. For a predecessor employer to be liable, it must have transferred pension plans with the intent to evade its pension obligations, and the plans must terminate within five years of when the suspect transaction became effective. 29 U.S.C. § 1369. Section 1362, by its own terms, fails to impose liability on previous employers. Because section 1369 now governs predecessor liability and curbs employer abuse of the PBGC insurance system, it would be improper to read an implicit predecessor liability rule into a section that has none.

When Congress addresses a subject in only one section of a reticulated statute, we assume the decision to omit the topic in another section was intentional. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion and exclusion." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)). Because section 1369 articulates a rule of predecessor liability and governs the transaction at issue, while section 1362 fails to expressly mention predecessor liability, we will not read a predecessor liability provision into section 1362.

### 2. *Sham Transaction*

█ Count I of the PBGC's amended complaint alleges that WCI's transfer of its pension plan liabilities was a sham transaction designed to avoid pension liability. The sale, the PBGC argues, therefore should be disregarded with respect to pension plan liability and WCI should be held liable under section 1362 as the employer on the date the plan terminated.

The sham transaction doctrine, originally developed in the context of tax cases, dictates that the substance and not the form of a transaction controls the tax consequences triggered by an event. *See Diedrich v. Commissioner of Internal Revenue,* 457 U.S. 191, 196, 102 S.Ct. 2414, 2418, 72 L.Ed.2d 777 (1982); *Knetsch v. United States,* 364 U.S. 361, 367, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960). This court has defined a sham transaction as one that "is fictitious or ... has no business purpose or economic effect." *Lerman v. Commissioner of Internal Revenue,* 939 F.2d 44, 53 (3d Cir.) (quoting *DeMartino v. Commissioner of Internal Revenue,* 862 F.2d 400, 406 (2d Cir.1988)), *cert. denied,* — U.S. —, 112 S.Ct. 590, 116 L.Ed.2d 615 (1991). The district court cited and applied this definition.

The PBGC first argues that this definition is not authoritative because the Supreme Court has recognized that a transaction may qualify as a sham even if it has a purpose and an effect in addition to tax avoidance. The PBGC relies on *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), to support this proposition. In *Gregory,* the taxpayer was the sole shareholder of Corporation A, which held some shares of Corporation B. The taxpayer wanted to transfer the shares of Corporation B to herself, and sell them for a profit. If Corporation A distributed the shares to the taxpayer as a dividend, their value would be taxable as ordinary income. To achieve the same result but receive preferential capital gain tax treatment, the taxpayer formed Corporation C, to receive the shares and then dissolve. Upon dissolution, Corporation C distributed its only asset, the Corporation B shares, to the taxpayer. The taxpayer argued that the transaction should be treated as a corporate reorganization. The Supreme Court held that the transaction was a sham, and should be ignored to calculate the resulting income tax. *See Gregory,* 293 U.S. at 469, 55 S.Ct. at 267.

The PBGC contends that the transaction in *Gregory* had dual objectives, to obtain per-

sonal profit from the sale of stock and to avoid personal income tax, yet the Court held that it was a sham. *Gregory*, 293 U.S. at 469–70, 55 S.Ct. at 267–68. The Supreme Court explicitly stated, however, that "the sole object and accomplishment of [the transaction] was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner." *Id.* at 469, 55 S.Ct. at 267. Therefore the structure of the transaction—the creation of Corporation C and the elaborate indirect method utilized to move the shares from Corporation A to the taxpayer—accomplished nothing other than tax avoidance. This court's definition of a sham transaction is consistent with *Gregory*.

The PBGC argues, in the alternative, that the factual allegations in its complaint are sufficient to support a claim that WCI's sale of its businesses and pension plans had no purpose or effect other than tax avoidance.[4] WCI argues that its sale of the steel businesses and their attendant pension plans was at least partially motivated by a desire to dispose of unprofitable businesses. Disposing of an unprofitable operation is a legitimate business purpose. *See Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1412 (7th Cir.1989) (transaction "designed to relieve [a party] of a part of its business that was producing significant losses" is a bona fide sale).

The PBGC acknowledges that the steel businesses were losing a significant amount of money each year. It is unclear from the pleadings, however, whether or not getting rid of these operating losses was a factor in WCI's decision to sell the businesses and pension plans. WCI's contention that one objective of the sale was to dispose of an unprofitable operation is undermined by the allegation that it summarily rejected any offer to buy the businesses that required it to retain the pension plan liabilities. Because

the complaint alleges that WCI was motivated solely by a desire to be relieved of pension liabilities, the PBGC's claim that the transfer was a sham will survive the motion to dismiss.

### III. *CONCLUSION*

For the foregoing reasons, we will affirm in part (the dismissal of Counts III and V) and reverse in part (the dismissal of Counts I and IV) the order of the district court, and remand for further proceedings consistent with this opinion.

---

4. PBGC contends that we should analyze whether the transfer of the pension plans, and not the entire transaction, was a sham. It is undisputed that at least part of the consideration Blaw Knox gave for the assets of the steel businesses was its assumption of the pension liabilities. Therefore, the sale of the businesses and the pension plans are intertwined and we cannot analyze them separately.