NYGAARD, Circuit Judge,
concurring and dissenting.
I agree that the District Court’s grant of summary judgment was proper as to plain *291 tiffs’ air rights claims, but for reasons different from those relied on by the majority. I also believe that although the District Court erred by converting defendant’s motion to dismiss into one for summary judgment, that error was harmless.
A. Air Rights
It is undisputed that the total appraised value of Rockefeller Center was $1.25 billion. It is also undisputed that 38.2 million shares were transferred during the buyout merger and that these shares were transferred at a price of $8.00 per share. Further, the Record shows that, viewing the proffered evidence in the light most favorable to the shareholders, the highest possible value for the ah’ rights was $42 million. By the following calculations, its “true” per share values result:[1]
$1.25 billion # 45# 38.2 million shares = $32.72 per share
$1.25 billion -I- $42 million = $1.292 billion
$1.292 billion #45# 38.2 million shares = $33.82 per share
Taking these figures and using basic ratios and proportions, it is clear that the resulting increase in share value is approximately 3.25%:
$32.72/share # 45# $8.00/share =
$33.82/share # 45# X
X = $8.26/share
$8.26/share is a value increase of approximately 3.25% over the base value of $8.00/share.
A 3.25% increase in value is immaterial. For this reason, I conclude that the Dis-triet Court properly granted summary judgment.
Moreover, the shareholders were placed on notice that the air rights were transferable as part of the Buyout Merger. The 10k annual reports, which were incorporated by reference into the proxy statements, disclosed that the air rights were allocable to Rockefeller Center under New York law and that under the RCPI mortgages the partnership owners reserved the right to transfer these rights. See JA 950 (stating that “there is allocable to the Property the right to develop up to approximately 2.0 million square feet of floor areas” that “may be transferred to other properties or, with the approval of the New York City Landmarks Preservation Commission, used to construct additional floor area within the Property,” and advising that “[t]he Borrower has reserved the right to transfer these rights” and “all of the Borrower’s rights to the air space above the Music Hall, together with easements for support, operations and access.” The 10k annual report also reveals that “as part of the settlement of a lawsuit, 100,000 square feet of these [air] rights were added to the Mortgage.”). I therefore conclude that the possible transfer of the air rights was properly disclosed to the shareholders.
B. Conversion of the Motion to Dismiss Plaintiffs’ General Electric Negotiations Claim
The majority has done a fine analysis, and I agree that the District Court improperly converted the motion by failing to provide the plaintiffs with adequate notice of the conversion. I do not believe, howev *292 er, that the proper mandate is to vacate and remand. Rather, I would inquire whether the conversion-was harmless error by determining whether the plaintiffs’ claims could have been dismissed under Rule 12(b)(6). We may affirm a judgment “if it appears that there is no set of facts on which plaintiffs could possibly recover.” Rose v. Barbie, 871 F.2d 331, 342 (3d Cir.1989) (citing Hancock Indus, v. Schaeffer, 811 F.2d 225, 229 (3d Cir.1987)).
It is undisputed that the following documents were submitted by the parties either to support, or oppose, the motion to dismiss the GE negotiations claim:
By the shareholders:
(1) an affidavit of Pamela S. Tikellis authenticating copies of documents incorporated into the proxy statement and amended complaint including RCPI’s annual reports for the years 1995 and 1996, filed on SEC Form 10-k
(2) three filings with the United States Bankruptcy Court for the Southern District of New York (the shareholders requested that the District Court take judicial notice of the bankruptcy court filings)
(3) two publicly filed letters from the New York City Planning Commission which was obtained under the Freedom of Information Act
(4) articles from the New York Times dated September 10, 1995 and September 12,1995
(5) a Form 13D/A filed with the SEC by defendant Goldman Sachs & Co. on May 3, 1996 that was relied upon by the shareholders in their Amended Complaint
(6) the transcript of a Bankruptcy Court hearing concerning the defaulted owners’ Chapter 11 plan
By the Defendants:
(1)two affidavits of Robert Payson authenticating copies of a publicly filed Proxy Statement and other SEC filings which the shareholders relied on for their claims
(2) excerpts from the defaulting owners’ Second Amended Joint Plan of Reorganization filed in the bankruptcy court on February 8,1996
(3) copies of new articles and other documents mentioned in the shareholders complaint
After receiving these various affidavits and other 538<!>documents, the District Court converted defendant’s 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment.
The general rule is that “a district court ruling on a motion to dismiss may not consider matter extraneous to the pleadings.” In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997); see also 5A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure §. 1366, at 93 (West 1990) (observing that Rule 12(b)(6) commands a court to convert a motion to dismiss into a motion for summary judgment “[ojnce the court decided to accept matters outside the pleading”). However, we have carved out some exceptions to this general rule. For example, a “ ‘document integral to or explicitly relied upon in the complaint’ may be considered ‘without converting the motion to dismiss into one for summary judgment.’” Burlington Coat, 114 F.3d at 1426 (quoting Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1220 (1st Cir.1996)). Thus, when an Amended Complaint quotes from certain press releases and public announcements, we may consider the entire text of those public statements. See Id. (commenting that “plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them”); In re Westinghouse, 90 F.3d 696, 707 (3d Cir.1996).
We have also allowed a court to consider matters of public record when ruling on a motion to dismiss. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993). For purposes of a motion to dismiss, however, matters of public record do not include all *293 documents which may be accessible to the public. Rather, it has been limited to the following documents: criminal case dispositions such as convictions or mistrials, letter decision of government agencies and published reports of administrative bodies. See id. at 1197 (citations omitted). Specifically, we have excluded from our definition of public record, for purposes of a motion to dismiss, material that “might be subject to disclosure under the [Freedom of Information Act].” Id. The reasoning for distinguishing between other recognized public documents and information obtained through the Freedom of Information Act is that the public does not have unqualified access to these documents; potential obstacles exist. First, one must submit a request for .the information to a Disclosure Officer. See 29 C.F.R. # 8E8E # 2603.32-2603.33. Second, the request may be denied if the company or entity considers the information non-disclosable. See id. §§ 2603.37-2603.38. Third, many categories of information may not be given to the public. See id. §§ 2603.17-2603.19, 2603.21. Finally, a requestor may appeal a denial under the Freedom of Information Act. See § 2603.39. Thus, the two letters submitted by the shareholders that involved correspondence from the New York City Planning Commission and that were obtained through the Freedom of Information Act cannot be considered on a motion to dismiss.
First, I agree with the approach of the Courts of Appeal for the Second and Fifth Circuits and would allow the District Court to take judicial notice of all public disclosure documents which are either required to be filed with the SEC or are actually filed with the SEC. See Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991); Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir.1996). As the Court of Appeals for the Second Circuit said:
the documents are required by law to be filed with the SEC, and no serious questions as to their authenticity can exist. Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated. Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court’s studying of the documents
This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements. We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.
Kramer, 937 F.2d at 774. This approach is consistent with our practice of allowing consideration of indisputably authentic documents which serve as the basis for plaintiffs’ complaint. See Pension Benefit Guar. Corp., 998 F.2d at 1196-97 (holding that “a court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiffs claims are based on the document” because “[wjhen a complaint relies on a document ... the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished”). .
I conclude that the District Court could properly consider the authenticated copies of SEC filings submitted by both the shareholders and the defendants, which relate to or are the basis for the shareholders’ complaint, on a motion to dismiss. In sum, the documents which are properly considered on a motion to dismiss are:
(1) an affidavit of Pamela S. Tikellis authenticating copies of documents incorporated into the proxy statement and amended complaint including RCPI’s an *294 nual reports for the years 1995 and 1996, filed on SEC Form 10 — k;
(2) articles from the New York Times dated September 12, 1995 and referenced in first Consolidated Amended complaint;
(3) a Form 13D/A filed with the SEC by defendant Goldman Sachs & Co. on May 3, 1996 that was relied upon by the shareholders in their Amended Complaint;
(4) two affidavits of Robert Payson authenticating copies of publicly filed Proxy Statement and other SEC filings which the shareholders relied on for their claims;
(5) copies of news articles and other documents mentioned in the shareholders complaint.
Looking at what can be properly considered on a motion to dismiss, the District Court's error of conversion is harmless because these documents support a dismissal of the complaint for failure to state a claim.
A determination of materiality “requires delicate assessments of the inferences a ‘reasonable shareholder’ would draw from a given set of facts and the significance of those inferences to him.” TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); see Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 n. 11 (3d Cir.1992). Thus, materiality is often a question for a jury. See TSC, 426 U.S. at 450, 96 S.Ct. at 2133. However, when a complaint alleging securities fraud contains claims of omissions or misstatements that are “so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality,” we may deem the misrepresentations and omissions immaterial as a matter of law. In re Westinghouse, 90 F.3d at 710; see In re Craftmatic Sec. Litig., 890 F.2d 628, 641 (3d Cir.1989).
An omission or misrepresentation is material if “there is- a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having ‘significantly altered the “total mix” of information’ available to that investor.” In re Westinghouse, 90 F.3d at 714 (quoting Shapiro, 964 F.2d at 281 n. 11). Thus, the shareholders need not prove that disclosure of the allegedly omitted facts would have changed their vote regarding the buy-out merger. See TSC, 426 U.S. at 449, 96 S.Ct. at 2132; see also Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097-98, 111 S.Ct. 2749, 2760-61, 115 L.Ed.2d 929 (1991).
Further, although information may be relevant and an investor may want to know that information, it may be “of such ‘dubious significance’ as to be ‘trivial,’ and ‘hardly conducive to informed decision making,’ so that to reasonable shareholders, such omission must be immaterial as a matter of law.” In re Westinghouse, 90 F.3d at 714 (quoting In re Westinghouse Securities Litigation, 832 F.Supp. 948, 972 (W.D.Pa.1993) (other quotations omitted)). Additionally, we have cautioned that when plaintiffs allege a claim akin to “failing to predict the future” it is often “difficult to ascertain whether the reasonable investor would have considered the omitted information significant at the time” especially “where an event is contingent or speculative in nature.” Shapiro, 964 F.2d at 283. However, these “opinions, predictions and other forward-looking statements are not per se inactionable.” In re Donald J. Trump Sec. Litig., 7 F.3d 357, 368 (3d Cir.1993). Materiality of contingent or speculative information or events depends on “a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.” Basic, Inc. v. Levinson, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citations omitted). “If the speaker does not genuinely and reasonably believe the opinions, then plaintiffs may support a claim for misrepresentation.” Id.
In light of our recent opinion in In re Advanta Securities Litigation, 180 F.3d *295 525 (3d Cir.1999), plaintiffs alleging a claim under 10b-5 must “ ‘state with particulari.ty facts giving rise to a strong inference’ of scienter. ” Id. at n. 5 (quoting 15 U.S.C. § 78u-4(b)(2) (West Supp.1999)). Although this pleading standard was not clear at the time plaintiffs filed their complaint, I do not believe Advanta requires a remand because plaintiffs’ claims concerning the GE negotiations cannot withstand a motion to dismiss even when the more lenient requirements of Federal Rule of Civil Procedure 9(b) are applied. Further, unlike my colleagues, I do not believe that the “complex principles of law and voluminous materials” render the District Court “better suited” to determine whether plaintiffs’ claims survive a motion to dismiss. I suggest the record supports the conclusion that the District Court’s conversion of the motion to dismiss was harmless error.
On appeal, the shareholders raise three main arguments to support their contention that the District Court erred by granting summary judgment as to the shareholders’ claims that the Board failed to disclose negotiations involving the sale of twenty percent of Rockefeller Center for $440 million. I will address each argument in turn.

1.Materiality of the Sale Negotiations was a question for the jury

The shareholders argue that they “had a number of choices when defendants solicited their proxies.” Shareholders’ Br. at 35. This is a classic example of “fraud by hindsight.” As the District Court observed, none of the facts presented by the shareholders, indeed, no set of facts, support the shareholders’ allegations that the Investor Group did not disclose material negotiations for the sale of a part of Rockefeller Center before the Buy-out Merger vote. None of the newspaper articles reveal that firm negotiations were underway. Rather, the articles show that at some point everything under the sun was being negotiated with numerous corporate entities to salvage the financial status of Rockefeller Center. Thus, the sale of Rockefeller Center was so speculative that it was immaterial as a matter of law.

2.The Buy-Out Group’s Uncorrected Denial of any Plan to Sell Part of Rockefeller Center in the Next Two Years

The shareholders also contend that Goldman Sachs and the defendants had a duty to disclose that they were contemplating a sale to GE/NBC especially in light of Goldman Sachs’s statement that it did not have a plan “to sell any or all of the twelve buildings [at Rockefeller Center] in the next few years.” The District Court correctly decided that non-disclosure of potential negotiations was immaterial as a matter of law. It is well settled, even mandated by SEC regulations, that a company is barred from including in proxy materials any tentative negotiations or plans, especially when those plans are only speculative. Further, this comment by Goldman Sachs cannot be attributed to the Investor Group. This statement was made on or before September 19, 1995, approximately ten to thirteen days before the Investor Group was formed. A 125. Therefore, the Investor Group and other defendants did not have a duty to update the statements originally made by Goldman Sachs.
3.A Sale is not “The Economic Equivalent” of a “Credit Lease Financing Agreement ”
The District Court concluded that:
GE’s interest in RCPI and in Rockefeller Center was well known. GE was a member of one of the three major groups bidding on RCPI in the fall of 1995, and GE’s involvement in the bidding process was well documented in the Proxy Statement. Defendants specifically disclosed the agreement between GE, the Zell Group, and RCPI to arrange a ‘lease financing’ based on GE’s credit rating.
*296 Charal Invest. Co. v. Rockefeller, Civ. A. No. 96-543-RRM, slip. op. at 16 (D.Del. Dec. 10, 1997). The shareholders urge that there is a critical distinction between a lease financing agreement and a sale to GE/NBC. According to the shareholders, a credit lease financing agreement was subject to several conditions and “[t]he Proxy Statement ... gave no indication that the cash which could be obtained from the credit lease financing would be adequate for RCPI to own and operate Rockefeller Center.” Shareholders Br. at 41. The shareholders submit that a sale, in contrast, “would have provided an immediate source of cash to RCPI without increasing the REIT’s debt.” Id. at 42. To support this argument, the shareholders take a passage from a Bankruptcy Court proceeding out of context and attempt to persuade this court that the statement, “The economics are so different now we ought to look at this from a different point of view” allows the “natural inference” that had the potential sale to GE/NBC been disclosed, “the cash generated by the sale would have sufficed for RCPI to assume control of Rockefeller Center without securing additional capital form its shareholders or other sources.” Id. at 43. A full reading of the Bankruptcy proceeding, however, shows that this statement was made in connection to whether the Debtors’ bankruptcy disclosure statement to its creditors needed updating.[2]
Moreover, the proxy materials clearly reveal that GE was interested in both RCPI and Rockefeller Center. The record shows that GE was part of the Zell Group. Therefore, if anyone would be aware of the possible sale of part of Rockefeller Center to GE, it would be GE. However, the Zell Group did not make a bid higher than the $8.00-$8.75 per share bid made by the- Investor Group. As such, the District Court properly concluded that “no reasonable shareholder would consider the potential sale of part of Rockefeller Center to be important in deciding how to vote.” Charal Investment Co., Civ. A. No. 96-543-RRM, at 17.
Additionally, the shareholders have not alleged that the refinancing agreements with Goldman Sachs were either fraudulent or illegitimate in any manner. Therefore, I do not believe that remanding the case to provide the parties an “opportunity to frame their arguments in light of ... Advanta ” is the most efficient, or even a necessary course. I would affirm.

. Although the shareholders do not dispute the $1.25 billion or the $42 million figures, they argue that the appropriate comparison for materiality is the potential value of the air rights if the shareholders' proposed minimum value of $30 million was incorporated into the per share value. Thus, they assert that they would not have considered $8.00 per share to be a "fair'' amount if they knew that the $1.2 billion appraisal did not consider the potential windfall of transferring the air rights. They suggest that the undeveloped air rights add at least an additional $0.78 to the per share value and this 10% increase in value is material. However, the shareholders' argument does not take into consideration that the $8.00 per share figure does not represent the "true” value of Rockefeller Center. Instead, it represents the distressed or fire sale value. As such, the proper measure of value cannot be determined by merely tacking on a hypothetical value of the air rights to the $8.00 per share value.

. We can consider the full text of the Bankruptcy proceeding in deciding the motion to dismiss because the plaintiffs have relied on various excerpts from the proceeding in their complaint.