

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-2000

# Pension Benefit Guar. Corp. vs. White Consol. Ind. Inc

Precedential or Non-Precedential:

Docket 99-3668

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Pension Benefit Guar. Corp. vs. White Consol. Ind. Inc" (2000). *2000 Decisions.* Paper 132.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/132

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 15, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3668

PENSION BENEFIT GUARANTY CORPORATION

v.

WHITE CONSOLIDATED INDUSTRIES, INC.,
c/o CT Corporation Systems Registered Agent,
         Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 91-cv-01630)
District Judge: Honorable Robert J. Cindrich

Argued March 13, 2000

Before: McKEE, RENDELL and ROSENN, Circuit Judges

(Filed June 15, 2000)

William G. McGuinness, Esq.
Fried, Frank, Harris, Shriver &
Jacobson
One New York Plaza
New York, NY 10004

and

David H. Marion, Esq. [ARGUED]
Howard J. Bashman, Esq.
Montgomery, McCracken, Walker &
Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
Counsel for Appellant

Nancy S. Heermans, Esq. [ARGUED]
Pension Benefit Guaranty
 Corporation
1200 K Street, NW
Washington, DC 20005
Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

White Consolidated Industries, Inc. ("WCI") appeals from an order entered by the District Court after a ten-day bench trial granting judgment in favor of Pension Benefit Guaranty Corporation ("PBGC") on counts one and four of its complaint and, accordingly, holding WCI liable for certain unfunded pension obligations pursuant to 29 U.S.C. SS 1362 and 1369.1 We conclude that the District Court did not err in determining that WCI was liable under section 1369 and will affirm on that basis.

We have jurisdiction to hear this appeal under 28 U.S.C. S 1291. We exercise plenary review over the District Court's

_____

1. PBGC's complaint sought only declaratory relief as to WCI's liability. JA 30. The amount of WCI's liability to PBGC is being resolved in a separate administrative proceeding.

2

conclusions of law. Express Services, Inc. v. Careers Express Staffing Services, 176 F.3d 183, 185 (3d Cir. 1999). We review findings of fact for clear error, and"due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed. R. Civ. P. 52(a); Anderson v. City of Bessemer City, North Carolina , 470 U.S. 564, 573 – 574 (1985). Likewise, we reviewfindings of ultimate fact for clear error. See ACM Partnership v. Commissioner of Internal Revenue, 157 F.3d 231, 245, n25 (3d Cir. 1998).

Facts

WCI, a home appliance manufacturer, became concerned in the early 1980s about the profitability and viability of a group of its divisions engaged in the steel business, the Blaw Knox companies ("BK businesses"). Based on the recommendations of an outside consulting firm, WCI unsuccessfully sought to sell or liquidate the BK businesses with the intent of retaining the grossly underfunded pension liabilities associated with those businesses. Efforts to market and sell the BK businesses initially were unavailing. By early 1985, WCI had identified a potential buyer, Joseph Cvengros. Cvengros proposed that, instead of offering cash, his company would assume the unfunded pension plans of the BK businesses with the intent of terminating the pension plans either immediately before or after the deal closed. This transaction was never consummated. Ultimately, WCI commenced negotiations with and found a buyer in Robert Tomsich, a long-time acquaintance of a WCI executive, and, in September 1985, WCI closed a deal with Blaw Knox Corp. ("BKC"), a thinly capitalized corporation established by Tomsich for the purpose of acquiring the BK businesses. The parties and their lawyers engaged in extensive negotiations leading up to the consummation of this transaction, and WCI internally considered several acquisition scenarios involving assumptions of differing amounts of pension obligations. The history of the negotiations discloses that WCI was aware that legislation then pending in Congress could render it liable for the unfunded pension benefits if the plans terminated within five years after the closing of the deal, while, at the same time, projections for the steel

3

industry generally, and BKC's future specifically, looked bleak.

The purchase and sale agreement ultimately provided, inter alia, that BKC would pay nothing for the businesses, but would assume the BK business pension liabilities. JA 1306, 1340.2 Yet, the agreement as crafted by WCI took steps to ensure that the pension plans would not falter before 1990, five years after the deal closed. WCI was required to contribute $20 million to the BK pension trusts in five equal annual installments, through September of 1990. JA 1328–1329. The agreement also required that BKC satisfy the minimum pension funding obligations "through and including the plan year beginning in 1990." JA 1344. WCI took a security interest in BKC's assets to secure BKC's obligation to assume the underfunded liabilities. BKC also was required to obtain a letter of credit in favor of WCI, on which WCI could draw in the event a claim or demand was brought against WCI with respect to the assumed BK plans. JA 1356–1359. WCI would reduce the letter of credit for the benefit of BKC over a period of five and a half years if there were no demands asserted against WCI with respect to the BK plans. BKC agreed to indemnify and hold WCI harmless for all benefits under the assumed plans, the minimum funding obligations of the plans, and termination of the assumed plans. JA 1343. WCI required that BKC submit financial information over the following five–year period as well.

In February 1992, after the five–year period ended, BKC failed and the largest of the BK pension plans was

_____

2. The parties disagree on the estimated unfunded pension liabilities of the BK businesses at the time of the WCI–BKC transaction. The District Court credited the $74.6 million estimate of PBGC's expert. Slip. Op. at 24. The District Court found that this estimate was consistent with WCI's estimate from the fourth quarter of 1984, $71.5 million, which was calculated for purposes of establishing a discontinued operations reserve. Slip. Op. at 25. The District Court essentially discredited WCI's later and lower estimates of the unfunded liability, which were calculated using different assumptions, e.g., $46.8 million as of January 1, 1985, and $40.2 million as of July 31, 1985. Slip. Op. at 27–29. Resolving this appeal does not require that we reconcile thesefigures.

terminated, pursuant to 29 U.S.C. S 4042(a), with
substantial underfunded obligations.3

Procedural History

PBGC filed a complaint to recover the unfunded
obligations from WCI under two theories: predecessor
liability under 29 U.S.C. S 1369 and as a sham transaction
under 29 U.S.C. S 1362. On September 11, 1992, the
District Court dismissed all five counts of PBGC's amended
complaint. JA 54.4 On appeal, we reversed in part, stating:

>We hold that the PBGC has stated a legally sufficient
>claim under 29 U.S.C. S 1369 (1988). Section 1369's
>requirement that a transaction "become [ ] effective"
>within five years of the plan termination is met because
>a transaction does not take effect until the previous
>plan sponsor stops making substantial payments to
>the pension plans. On the other hand, because section
>1369 specifically addresses predecessor liability and
>applies to this transaction, we will not read an

_____

3. In its amended complaint, PBGC estimated this unfunded liability to
be $81,600,000. JA 30, 46.

4. The District Court found that PBGC failed to state a claim that WCI
was a contributing sponsor under the sham transaction theory in count
one because the Court saw "no reason why ridding oneself of an
unprofitable operation serves no legitimate business purpose." JA 62
(Slip. Op. at 9). The District Court dismissed count two, which sought to
hold WCI liable under section 1362 based on the fact that that BKC
defaulted on its security agreement with WCI, because "[f]or WCI to have
the right to possession of BKC's assets, a [p]lan termination must exist,
a condition over which WCI had no control" prior to 1992. JA 64 (Slip.
Op. at 11). The District Court dismissed count three, based on an
implied termination/predecessor liability theory, because even if it
accepted the validity of that theory, the Court did not believe it
extended
to circumstances in which the buyer remains in business and the plans
are not terminated within five years after the sale. JA 68 (Slip. Op. at
15). Count four, a section 1369 count, was also rejected based on the
District Court's view that WCI was neither an employer nor a plan
sponsor after September of 1985. JA 71 (Slip. Op. at 18). Because the
District Court found that WCI's individual payments to the BK plans
were not separate transactions to evade liability within the meaning of
section 1369, the District Court dismissed countfive as well. JA 71-72
(Slip. Op. at 18-19).

5

unexpressed predecessor liability rule into 29 U.S.C. S 1362 (1988). Additionally, the PBGC's claim that the transaction at issue is a sham also survives the motion to dismiss. We therefore will affirm in part and reverse in part the order of the district court, and remand for further proceedings consistent with this opinion.

Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192, 1194 (3d Cir. 1993) ("WCI 1").

On remand, and after a ten-day bench trial, PBGC prevailed on counts one and four of its complaint. 5 In a comprehensive ninety-page opinion, the District Court found that WCI was liable under section 1369, the express predecessor liability provision. The District Court also determined that the WCI-BKC sale transaction should be disregarded as a sham for purposes of holding WCI liable as a contributing sponsor under section 1362.

WCI challenges several aspects of the District Court's decision. WCI contends that it is not subject to liability under section 1369 because the WCI-BKC transaction closed prior to section 1369's effective date. And, even if section 1369 were applicable, WCI argues, the District Court misapplied that provision. WCI also urges that the District Court erred in finding that the WCI-BKC transaction was a sham and thus WCI is liable as a contributing sponsor under section 1362. Because we base our holding on section 1369, we first turn to that issue.

Section 1369; Treatment of Transactions to Evade Liability

Section 1369(a), "Treatment of transactions to evade liability," provides in pertinent part:

    If a principal purpose of any person in entering into any

_____

5. Count one asserts that the transfer was a"sham" designed to allow WCI to avoid pension liabilities, and thus WCI should retain liability as a contributing sponsor under 29 U.S.C. S 1362. JA 47. Count four asserts that a principal purpose of WCI's transaction with BKC was to evade underfunded pension obligations, making WCI liable under 29 U.S.C. S 1369, as well as under section 1362. JA 49.

> transaction is to evade liability to which such person
> would be subject under this subtitle [29 U.S.C. S 1361
> et seq.] and the transaction becomes effective within
> five years before the termination date of the termination
> on which such liability would be based, then such
> person . . . shall be subject to liability under this
> subtitle [29 U.S.C. S 1361 et seq.] in connection with
> such termination as if such person were a contributing
> sponsor of the terminated plan as of the termination
> date.

29 U.S.C. S 1369(a) (emphasis added). Congress expressly
provided that section 1369, which was enacted in April of
1986, "shall apply with respect to transactions becoming
effective on or after January 1, 1986." Pub. L. No. 99-272,
S 11013(b), 100 Stat. 261 (1986) (emphasis added).

Applicability of Section 1369 to WCI-BKC Transaction

In WCI 1, we considered whether section 1369 applied to
WCI in view of the fact that the BK plan termination
occurred more than five years after the closing of the WCI-
BKC transaction. Noting that the statute speaks in terms of
when a transaction "becomes effective," not when a
transaction closes, we rejected the notion that the
transaction necessarily became effective on the closing
date. Instead, we determined that a "transaction does not
become effective for purposes of section 1369 until the
company that transferred a pension plan no longer makes
substantial pension contributions." WCI 1, 998 F.2d at
1199. Thus, we concluded that the WCI-BKC transaction
did not become effective until 1990, when WCI ceased
making annual contributions to the BK pension plans, and
the termination fell within the requisite five-year period.
Given our holding that the WCI-BKC transaction became
effective in 1990, we correspondingly held that section 1369
applies to the WCI-BKC transaction, which became effective
after the effective date of the statute. Id. at 1199, n. 2.6 In
light of our conclusion, the District Court held that it was

_____

6. We applied this holding in a companion opinion issued on the same
day that WCI 1 was decided, Blaw Knox Retirement Income Plan v. White
Consolidated Indus., Inc., 998 F.2d 1185 (3d Cir. 1993). In this case, the
BK pension plans had sued WCI alleging, inter alia, section 1362 and
1369 liability, and the District Court had dismissed the complaint. Citing
and adopting the rationale of WCI 1, we held that the BK plans stated
a legally sufficient claim for relief in Count V of their complaint under
section 1369 and, accordingly, reversed the dismissal of that Count. Id.
at 1187.

7

bound by WCI 1 to apply section 1369 to the WCI–BKC transaction. Slip. Op. at 80.

WCI argues on appeal that the District Court was not bound by our previous ruling, that it adopted an overbroad reading of the WCI 1 holding, and that it erred by "retroactively" applying section 1369 to the WCI–BKC transaction, which closed on September 27, 1985. WCI contends that WCI 1 did not actually determine that section 1369 is applicable here because our statement on this issue was relegated to a short footnote, was devoid of legal analysis, and ran afoul of the Supreme Court's dictates with respect to when a statute has retroactive effect. Even if WCI 1 is law of the case on this issue, WCI contends, we should re-examine the application of section 1369 to this transaction in light of the supervening change in the law of retroactive application of statutes effected by the Supreme Court's decision in Landgraf v. USI Film Prods. , 511 U.S. 244 (1994). See generally Mathews v. Kidder Peabody & Co., 161 F.3d 156, 161 (3d Cir. 1998) (setting forth steps to determine whether statute should be applied retroactively).7

We are persuaded that our statement in WCI 1 regarding the applicability of section 1369 to the WCI–BKC transaction is the law of the case. Likewise, we hold that the District Court correctly recognized that our ruling in WCI 1, footnote and all, dictated the application of section 1369 to the WCI–BKC transaction. We reject WCI's contention that the Supreme Court's decision in Landgraf requires that we re-examine the law of the case. This argument might have merit if, in WCI 1, we had analyzed the statute's retroactivity in a way now forbidden by

_____

7. Mathews summarized the framework for retrospective application of statutes, synthesized from Landgraf and Lindh v. Murphy, 521 U.S. 320 (1997), as follows:

> (1) look for an express command in either direction; (2) discern whether there is congressional intent to only apply a statute prospectively; (3) analyze the statute for retroactive effect; and (4) look for clear intent to apply the statute retrospectively (if it has retroactive effect) or simply use normal rules of construction to determine the statute's temporal reach.

> Mathews, 161 F.3d at 161.

Landgraf, making Landgraf a supervening change in the law with respect to this issue. See In re Minarik, 166 F.3d 591, 595 (3d Cir. 1999) (describing Landgraf as "the landmark case which establishes the analytical framework governing retroactivity issues"); Public Interest Research Group of New Jersey, Inc. v. Magnesium Electron, Inc., 123 F.3d 111, 116-117 (3d Cir. 1997) (explaining that a supervening change of law is a type of extraordinary circumstance that would justify reconsideration of an issue previously decided). However, that is not the situation. In WCI 1, we applied section 1369 prospectively, not retroactively, because, based on our interpretation of the phrases "becomes effective" and "becoming effective" we held that the event triggering the application of the statute did not occur until 1990, well after the statute's effective date. Accordingly, we have no occasion to re-examine the law of the case based on principles of retroactivity. Section 1369, by its terms as we have construed them, applies to the WCI-BKC transaction.

A Principal Purpose to Evade

Turning to the merits, WCI challenges the District Court's substantive application of section 1369 to the WCI-BKC transaction. In particular, WCI contends that, in assessing whether a principal purpose of the transaction was to evade pension liability, the District Court erroneously focused on after-the-fact assessments of BKC's economic viability and value, rather than relying on evidence of WCI's purpose, including its beliefs about the amount of pension liabilities and BKC's ability to pay them at the time of closing. As will be explained below, we agree with WCI, albeit for different reasons, that the District Court's reliance on after-the-fact objective assessments of BKC's economic health did not comport with the requirements of section 1369. However, this conclusion does not in any way compel reversal because we find adequate evidence, as did the District Court, that a principal purpose of WCI's sale was to evade these obligations.

Relying on statements in WCI 1, the District Court noted that section 1369 was a codification of the implicit predecessor liability theory of section 1362, which was enunciated for the first and only time in one district court

9

opinion, In re Consol. Lit. Concerning International Harvester's Disposition of Wisconsin Steel, 681 F. Supp. 512 (N.D. Ill. 1988) ("International Harvester "). Adopting the test used in International Harvester to assess implied termination/predecessor liability under section 1362, the District Court proposed that the finding of liability under section 1369 should proceed as follows:

> The first step is an objective analysis which requires the court to make an initial determination of whether a transferred plan remained viable for five years under a new sponsor, beginning from the time that the predecessor sponsor no longer makes substantial pension contributions. If the answer is yes, the analysis ends here and no liability may be imposed upon the predecessor sponsor. If the plans do terminate within a five year period, the court must determine on an objective basis whether the new sponsor lacked a reasonable chance of meeting the pension obligations. The court must then examine the predecessor sponsor's subjective intent at the time of entering into the transaction and determine whether a principal purpose of entering into the transaction was to evade pension obligations. . . . If a principal purpose of entering into the transaction was to evade pension obligations and the new sponsor lacked a reasonable chance of survival, then the predecessor sponsor is liable for the terminated plans.

Slip. Op. at 85-86 (emphasis added). We submit that the portion of the District Court's test that focuses on the economic health of the transferee lacks support in the language of section 1369. Furthermore, in WCI 1 , we read the five-year provision as having replaced the"reasonable chance of success" inquiry:

> The second prong of the Harvester test required the plaintiff to prove that the new employer had no reasonable chance of fulfilling the pension obligations it assumed. In its place, Congress substituted the requirement that the plan terminate within five years of the date the transaction became effective . . . . Congress apparently believed that if a plan terminated within five years of being transferred, it was fair to

10

assume that the new employer did not have a reasonable chance of succeeding at the time of the transfer. Congress also believed that if a plan remained viable for five years under a new sponsor, the previous employer should have the benefit of an irrebuttable presumption that the new sponsor had a reasonable chance of fulfilling the pension obligations it assumed. It is reasonable to assume that Congress viewed the amount of time a pension plan survived after a change of sponsorship as reflective of the economic condition of the new sponsor at the time of the transfer. Using this easily quantifiable surrogate, Congress fashioned a bright line rule.

WCI 1, 998 F.2d at 1199. Based on the plain language of section 1369, we hold that section 1369 does not require, as an independent element, proof that the new sponsor lacked a reasonable chance of succeeding. In reaching this conclusion, we do not mean to suggest that evidence of the transferee's viability cannot be considered in ascertaining a transferor's primary purposes of entering into the transaction, but only that it is not an independent predicate for section 1369 liability. Accordingly, we need not address WCI's specific challenges to the evidence of BKC's viability or the District Court's treatment of that issue.

The key section 1369 inquiry is whether WCI had "a principal purpose" of evading its pension liabilities. We conclude that both documentary and testimonial evidence amply support the District Court's findings of fact regarding WCI's intentions to evade pension liability, and we uphold the District Court's legal conclusion that WCI is liable under section 1369. As outlined below (and as described in WCI 1 in the context of the motion to dismiss), the chain of events documented in the record illustrate that evasion of WCI's unfunded BK pension liabilities was a principal purpose of entering into the WCI–BKC transaction, and played a major role in shaping the terms of that transaction.

Although WCI had designs on disposing of its unprofitable non-core steel industry divisions in 1984, WCI started to specifically consider the ramifications of

11

transferring the BK businesses' unfunded pension liabilities in early 1985. See, e.g., JA 3437 (February 26, 1985 memorandum to Ware from Morse regarding the sale of certain BK businesses) ("The question as to whether [WCI] could have some liability for unfunded pension benefits if the new owners were to terminate the plans or end up in bankruptcy, is unclear").

WCI's lawyers researched various theories that PBGC could assert to hold WCI accountable for unfunded pension liabilities of the BK businesses, including pending legislation that imposed contingent liability on a seller for at least five years. JA 3458 (April 1, 1985 memorandum to WCI – Blaw–Knox file from Draucker); JA 3486 (April 18, 1985 memorandum to WCI – Blaw–Knox file from Draucker re: "Underfunded defined benefit plan – liability of seller") (providing more detailed explanation of pending predecessor liability legislation with five–year contingent liability period); JA 3493 (April 23, 1985 memorandum to Ransom from Draucker) (reporting on PBGC's efforts to impose predecessor liability for unfunded pension obligations in the International Harvester case). These memoranda noted that a seller might wish to account for the possibility of predecessor liability when structuring a deal with the buyer to ensure that these liabilities fall on the buyer. WCI's lawyers sent WCI executives information regarding the International Harvester litigation. JA 3497 (April 24, 1985 letter to Ware and Elliot from Draucker). WCI executives were aware that PBGC might seek to hold WCI responsible under several theories, including some that might have a five–year contingent liability period. See, e.g., JA 5315, 5289 (Hunt deposition).

In a memorandum from April 24, 1985, the day before a meeting with Cvengros, WCI's general counsel listed as the first subject for discussion regarding the sale as"[D]oes purchaser agree generally with Wyatt [WCI's actuary] analysis of the unfunded pension liability and retiree pension costs," and described that issue as one of the key matters for discussion. JA 1151, 1152 (April 24, 1985 memorandum to Ware, Hunt & Jacobs from Elliot). Also listed for discussion was "[W]hat is significance of Wisconsin Steel–Harvester litigation on [lawyers'] conclusions on residual WCI pension liability?" JA 1151.

12

Consideration of Cvengros' proposal to terminate the BK plans directly before or after purchasing the BK businesses brought WCI's risk of underfunded pension liability exposure sharply into focus. Ransom's file notes from the April 25, 1985 Cvengros meeting describe the proposal for immediate post-closing termination as a "two-edged sword," leaving "very little room for WCI to avoid an International Harvester/Wisconsin Steel situation or other possible theories of [s]eller liability." JA 1175 (April 28, 1985 memorandum to file from Ransom, enclosed with April 29, 1985 letter to Hunt from Ransom). Ransom's handwritten notes from the meeting listed as a problem "PBGC-- must still get over dumping initially – not necessarilyfive years." JA 1165. See also JA 746 – 747 (trial transcript, March 11, 1997, Ransom).

Alternatively, Cvengros had proposed to terminate the plans before the parties consummated the sale, about which Ransom's notes state:

> Needless to say, terminating the plans prior to the closing would put WCI squarely on the hook as the employer that maintained the plans at the time of termination and the PBGC would not even have to use International Harvester/Wisconsin Steel principles or any other theory of seller liability. At least if the plans terminate after the closing, WCI has a plausible basis for asserting that it is not responsible for the liabilities.

JA 1176. This deal was abandoned.

The structure of the transaction negotiated with Tomsich was different, and to WCI's liking. WCI was to transfer most, if not all, of the BK pension liabilities to BKC, and it was agreed that the BK plans would not be terminated during the following five years, during which time it was most likely that WCI would be held contingently liable as a predecessor.

Even absent the Cvengros proposal to terminate the BK pension plans, WCI was aware that early termination of the BK plans was more than a remote possibility. See, e.g., JA 1208 (June 12, 1985 letter to Hunt from Reynolds of Wyatt, WCI's actuary); JA 3580 (June 12, 1985 memorandum to WCI file from Reynolds re: meeting with attorney); JA 1165

13

(Ransom's notes from April 25, 1985 meeting) ("still run risk of terminating -- at least in first 5 years"); JA 1211 (Ransom's notes from June 19, 1985 meeting with WCI executives) (noting disadvantages of certain deal structures in the event that the buyer terminated pension plans early). Given this state of affairs, WCI's lawyers were clearly working on how to structure the deal so as to minimize WCI's unfunded pension liability exposure. See, e.g., JA 1035 (June 18, 1985 memorandum to Holdt, Smith and Ware from Hunt and Elliot re: Disposition of the Blaw Knox Companies) ("We will be counseled throughout by Squire, Sanders & Dempsey on this matter to minimize our exposure . . . . The overall economic benefit of this transaction, in our judgment, far outweighs this remote risk.").

In the context of discussing pension liabilities, WCI executives expressed significant concern "about getting the five year period behind them" and "wanted the prior service liability to be as low as possible." JA 1205 (June 10, 1985 memorandum to Tomsich from Nehrig, reporting on meeting with Hunt and Ware). WCI's executives understood that the "principal economic benefit to WCI" of the disposition of the BK businesses was the buyer's assumption of unfunded pension liabilities and the obligation to provide insurance to certain retirees. JA 1034 (June 18, 1985 memorandum to Holdt, Smith, and Ware from Hunt and Elliot).

Even after WCI had signed a letter of intent with Tomsich setting forth the basic parameters of the deal, WCI continued to shape the transaction in a way that it believed would provide maximum protection from being held responsible for the unfunded pension liabilities. 8 When WCI commenced its negotiations with Tomsich, it had intended to retain at least some of the dedicated pension assets and liabilities. WCI consulted with its actuary and counsel on

_____

8. WCI's Board of Directors reserved its right to approve the WCI-BKC deal in the event that the agreement reflected"more than a $10 million adverse variance from the projected $67 million savings from the originally booked pre-tax loss relative to the divisions" at issue. JA 1248
(Minutes of Special Meeting of Board of Directors, July 30, 1985).

14

the extent to which the buyer -- and not WCI -- would be required under the possible scenarios to provide for all unfunded pension liabilities in the event that the BK plans terminated. See JA 1207-1208 (June 12, 1985 letter to Hunt from Reynolds, WCI's actuary re: Blaw Knox pension plans - Treatment of the Dedicated Bond Fund). WCI ultimately rejected the option that its actuary identified as potentially leaving WCI directly liable for certain unfunded pension liabilities, and instead required that the transaction be structured so that BKC assumed all assets and liabilities, including dedicated liabilities, the option identified by WCI's actuary as increasing the buyer's exposure.9 WCI's executives remained concerned about whether the transaction was "outside of sham." JA 166 (Joint statement of uncontested facts); JA 5287 (Hunt deposition). See also JA 1034 (June 18, 1985 memorandum to Holdt, Smith, and Ware from Hunt and Elliot) (discussing PBGC's assertion of sham against other predecessors).

Ransom's notes for a June 19, 1985 meeting indicate the advantages of structuring the deal in this fashion, all of which relate to the possibility of WCI's evading liability for its unfunded pension obligations:

> What do we want Buyer to do with plans?
>
> A. Maintain plans for at least 5 years? (i.e. until 1/1/90?)
>
> Advantages
>
> (1) In some ways may look better to PBGC (xc 5 year limit could look like evasion) - Certainly it doesn't look as much like a dumping.
>
> (2) If Buyer does it, it should take WCI off statutory hook (xc for new legislation).

_____

9. Although the record generally reflects arms-length bargaining for the most part, Tomsich apparently was willing to accept less favorable terms for BKC because he had limited his own unfunded pension liability exposure by owning less than 80% of the acquiring corporation. See, e.g., JA 929 (trial transcript, March 14, 1997, Elliot).

15

. . .

    (5) . . . would not invite PBGC in. . .

JA 1214.10 To maximize its bargaining leverage, WCI was discouraged by its attorney from disclosing the deal to PBGC ahead of time:

> Any discussions with the PBGC, although they would seem to be desirable, would have to be entered into with the understanding that they could turn out to be so unsatisfactory as to kill the deal. If the deal went forward without discussions with PBGC, any problems with PBGC would then have to be worked out in the context of actual termination of the plan. At that point the situation might be sufficiently cloudy as far as the PBGC is concerned (i.e. they might have to use International Harvester/Wisconsin Steel theories in litigation to recover on its own terms from WCI), that the parties might actually have more leverage in dealing with the PBGC.

JA 1178. See also JA 148 (Joint statement of uncontested facts); JA 740 (trial transcript, March 11, 1997, Ransom).

WCI's intent to avoid its unfunded pension obligations was hardly lost on other parties and professionals. The Minutes of the Metropolitan Credit Committee, BKC's lender, describe the situation as follows:

> Another major problem is an unfunded pension health and life liabilities of approximately $61 mm. WCI wants relieved [sic.] from this liability . . . . While the laws are somewhat unclear, WCI feels it could be obligated on the past unfunded pension obligation and health and life liability for up to five years (the PBGC can go after them) if BKC does not fund the required payments annually.

JA 1272, 1274.

Tomsich likewise testified that he was aware WCI was concerned about keeping the BK pension plans alive for five

_____

10. A noted disadvantage was that "PBGC might step in anyway and initiate terminations." JA 1215.

16

years. JA 573 (trial transcript, March 6, 1997). Although WCI did not explain its reasoning to Tomsich directly, Tomsich's counsel told him that the concern about the five-year period had "something to do with some kind of requirement that the liability would disappear afterfive years from the seller." Id.

WCI therefore determined that the buyer of the BK business should be required to maintain and meet the minimum funding obligations for the pension plans until 1990. JA 1217 – 1218 (Notes from June 19, 1985 meeting at WCI); JA 1224 (June 21, 1985 notes to file from Reynolds re: meeting with client).11 The deal that WCI designed and ultimately consummated, the details of which we have already described, infra, was clearly structured to keep the underfunded BK pension plans from terminating for five years after the deal closed, and to shift as much of the unfunded pension responsibility as possible to BKC in the event of termination.12

The evidence clearly supports the District Court's determination that WCI had a principal purpose of evading pension liabilities. WCI was aware of the ways in which it might be held liable for its past unfunded pension liabilities and took steps to transfer those liabilities and prevent the plans from terminating while it still might be held partially or fully responsible. Moreover, WCI rejected any deal that

_____

11. Although WCI offered evidence to provide an alternative explanation for their interest in the five-year period, the District Court discredited that testimony and found it to be wholly undermined by other documentary evidence. See Slip. Op. at 50. We apply a deferential standard of review to the District Court's credibility determinations and do not overturn the Court's determinations here.

12. The resolution of a post-sale dispute, in which BKC alleged that WCI had made misrepresentations about the BK pension liabilities, also is telling. In resolving this dispute, Hunt (now working for BKC) noted that WCI sought to avoid unwanted PBGC attention. JA 1451–1453 (Hunt's handwritten notes from conference call, referring to dispute as "smoking gun" that could cause damage to WCI). The formal agreement settling the dispute conditioned the settlement on BKC and WCI refraining from suggesting that either party had engaged or acquiesced in any action, policy, or practice that would constitute a violation of law or policy. JA 4415, 4417.

did not include the transfer of pension liabilities to the buyer. This is simply not a case in which a corporation sought to transfer pension liabilities as part of a legitimate divestiture of unprofitable subsidiaries. Rather, this is a case in which the transferor, WCI, sought to use the transfer of a group of failing businesses as a means of evading the pension liabilities associated with those businesses. Had WCI 1 started the five-year clock in 1985 when the deal closed, rather than in 1990 when WCI ceased propping up the pension plans, WCI's plan to evade its liability may very well have been successful. We will affirm the District Court's judgment that WCI is liable under section 1369.

Amount of Liability under Section 1369

WCI raises an additional challenge to the District Court's ruling on section 1369, contending, somewhat cryptically, that PBGC failed to establish the amount of underfunding WCI was liable to pay on the date of the transaction. WCI argues, therefore, that the District Court used an erroneous and "non-statutory" measure of liability to gauge WCI's intent. Brief for Appellant at 51. WCI's argument is based on the language of section 1369(a), which states that a person is responsible for "the liability to which such person would be subject under this subtitle." 29 U.S.C. S 1369(a) (emphasis added). In addition to challenging this argument on the merits, and asserting that WCI would be liable under section 1369 even using WCI's own estimates, PBGC alleges that WCI waived this argument by failing to raise it at trial or in its proposed conclusions of law after the evidence was presented.

In its reply brief, WCI argues that it "contended repeatedly in the [D]istrict [C]ourt that the PBGC had failed to establish that WCI acted with a principal purpose to evade its statutory liability to the PBGC," citing to a portion of its proposed findings of facts and conclusions of law that it filed May 14, 1997. Reply Brief for Appellant at 28. WCI does not refer to, nor can we discern, a proposedfinding that asserted or preserved the specific argument that WCI now makes regarding proof of the actual amount of liability as an element of section 1369. See SA-213 - SA-223.13 If

_____

13. Citing Rule 52(b) of the Federal Rules of Civil Procedure, WCI also argues that the losing party in a non-jury trial is not required to argue

18

this issue was not specifically presented to the District Court, we need not address it on appeal.14

Curiously, the District Court did address the need for proof of the amount of WCI's liability, although its opinion does not frame the question as being dependent on the language of section 1369 as WCI now urges. We are left with uncertainty as to whether WCI's argument was raised, but merely not documented adequately in the record before us. Whether WCI waived this issue does not affect our holding because we conclude that proof of the actual amount of liability is not necessary in this proceeding. As WCI essentially recognizes, see Brief for Appellant at 54, once it is determined that a person is subject to section 1369 liability "as if such person were a contributing sponsor," the amount of liability should be calculated in

_____

that insufficient evidence exists to support the District Court's findings in order to advance that argument on appeal. Reply Brief for Appellant at 28. Rule 52(b) provides in pertinent part that"[w]hen findings of fact are made in actions tried without a jury, the sufficiency of the evidence supporting the findings may be later questioned whether or not in the district court the party raising the question objected to the findings, moved to amend them, or moved for partial findings." FED. R. CIV. P. 52(b). However, we do not read WCI's assertion to be an attack on the sufficiency of the evidence, but rather to be an argument that the District Court erred by ignoring a specific requirement embedded in section 1369.

14. See, e.g., The Medical Protective Co. v. Watkins, 198 F.3d 100, 105 n3 (3d Cir. 1999) (finding that one of defendants' arguments was waived for failure to raise issue in district court); Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 524 n6 (3d Cir. 1999) (holding that Diamond waived its equitable subrogation argument on appeal because, "[a]lthough Diamond claims that it made this argument in its brief opposing Gulf Coast's motion for summary judgment . . . our review of that brief convinces us that this argument was not fairly raised") (citing United States v. Anthony Dell'Aquilla Enters., 150 F.3d 329, 335 (3d Cir. 1998) (rejecting argument that government did not present prima facie case for certain violations because, absent exceptional circumstances, an issue not raised in district court will not be heard on appeal)); Keenan v. City of Philadelphia, 983 F.2d 459, 471 (3d Cir. 1992) (holding that defendants waived argument that evidence of theirfinancial status is a prerequisite to punitive damages because they failed to present the argument "with sufficient specificity to alert the district court").

accordance with the procedures for determining liability under section 1362. Establishing the amount of liability under section 1362 in the first instance, as the District Court explained, begins with an administrative -- not judicial -- procedure. See Slip. Op. at 88 -91 (citing 19 C.F.R. 4068.3). Thus, whether or not WCI waived this argument, we conclude that the District Court did not err when it declined to fix the amount of WCI's liability.

As an alternate ground for liability, the District Court also held that the transaction ran afoul of 29 U.S.C. S 1362 based on the sham transfer doctrine. Having affirmed the District Court's finding of WCI's liability under the express provision for predecessor liability set forth in section 1369, it is unnecessary for us to review its conclusion that liability could alternatively be based on 29 U.S.C.S 1362 using the sham transfer doctrine. Accordingly, we do not rule on the merits of the District Court's application of the sham transfer doctrine to impose section 1362 liability.15

For the foregoing reasons, we will AFFIRM the District

---

15. Although section 1362 does not apply on its face to WCI because WCI was not a contributing sponsor when the BK plan was terminated, PBGC alleges, and the District Court held, that WCI should be held liable as a contributing sponsor under section 1362 because its transfer of the BK businesses to BKC should be disregarded as an economic "sham." WCI has not specifically challenged the application of the sham transfer doctrine to ERISA liability, but we note that there is a dearth of
authority for extending the sham transfer doctrine to the ERISA context. In WCI 1, we discussed the sham transfer theory as if it could apply without specifically analyzing its applicability. We are not certain that the tax policy considerations at the heart of the sham transfer doctrine translate neatly when used to disregard a sale transaction for purposes of imposing pension liability. In addition, if we assume this doctrine does
apply, we have some concern about the District Court's finding that the WCI-BKC transaction was a sham insofar as this ruling was based on the Court's assessment of WCI's subjective intent, notwithstanding its finding that the transaction had economic substance. Because we have affirmed the District Court's finding of WCI's liability on other grounds, however, we will refrain from delving into a full-fledged analysis and critique, leaving for another day the next step to be taken into the muddy waters of sham transfer jurisprudence.

Court's grant of judgment in favor of PBGC and against WCI on Count IV of PBGC's amended complaint.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit