363 F.Supp.2d 728 (2005)
K.J., T.J. and M.J., by their Guardian ad litem, Marcia Robinson LOWRY, Plaintiffs,
v.
DIVISION OF YOUTH AND FAMILY SERVICES, Department of Human Services, State of New Jersey, Patricia Belasco-Barr, Michele Guhl, Charles Venti, Doris Jones, Managerial Does 1-10, Supervisory Does 1-10, and Casework Does 1-10, Defendants.
Civil Action No. 04-3553(SSB).
United States District Court, D. New Jersey.
April 6, 2005.
*729 *730 *731 *732 *733 Richard L. Bazelon, Esq., Steven K. Kudatsky, Esq., Bazelon, Less & Feldman, P.C., Marlton, NJ, for Plaintiffs.
Richard D. Emery, Esq., Eric Hecker, Esq., Emery Celli Brinckerhoff & Abady LLP, New York City, of Counsel to Plaintiffs.
Marcia Robinson Lowry, Esq., Children's Rights, Inc., New York City, Guardian ad litem for Plaintiffs.
James D. Harris, Esq., Karen L. Jordan, Esq., Office of the N.J. Attorney General, Trenton, NJ, for Defendants.
Kevin Ryan, Esq., Executive Director, Office of the Child Advocate, Trenton, NJ, Representing the Office of the Child Advocate.

OPINION ON MOTION TO DISMISS UNDER RULE 12(b)(6)
BROTMAN, District Judge.
On October 10, 2003 Plaintiffs' older brother, B.J., was observed eating out of a trash can in Collingswood, New Jersey.[1] (OCA Rpt. at 1.) Police responded to an early morning call about a "little kid" eating garbage and encountered an evidently malnourished nineteen year-old. B.J. weighed just forty-five pounds and stood only four feet tall. (Id.)
Investigations led police to the Jackson home, where B.J. lived with his adoptive parents as well as Plaintiffs K.J., T.J. and M.J. ("Plaintiffs" or the "Minor Children"). Plaintiffs appeared to be "dramatically underweight." (Id.) Consequently, the three Plaintiffs and their older brother B.J. were removed from the Jackson home and taken immediately to a local hospital. (Id.)
Plaintiffs commenced this lawsuit seven months later, naming the State of New Jersey, New Jersey Division of Youth and Family Services ("DYFS"), the New Jersey *734 Department of Human Services ("DHS"), present and former directors of DYFS, and individual caseworkers and supervisors of DYFS.[2] This Opinion and accompanying order concern a Motion to Dismiss for failure to state a claim upon which relief can be granted on behalf of Defendants' State of New Jersey, DYFS, DHS, and the present and former directors of DYFS (collectively the "State Defendants") pursuant to Fed. R. Civ. Pro. 12(b)(6).[3]
I. FACTUAL BACKGROUND.
Defendants approved the Jacksons as foster parents in August of 1991 and placed B.J. with them in December 1991. (Compl. at ¶¶ 26, 27.) At the time B.J. was placed in the foster home he weighed 43.75 pounds and stood 48.25 inches tall. (Compl. at ¶ 27.) He was seven years old. (Id.) Comparatively, when B.J. was discovered eating garbage twelve years later, he weighed only forty-five pounds and was four feet tall. (Id.) During the twelve years after B.J. began living in the Jackson home, Defendants placed each of the Plaintiffs there and repeatedly visited the household.[4]
Plaintiffs allege that Defendants were obligated by statutes, regulations, and internal agency policies to visit and inspect the living conditions of the children. (OCA Rpt. at 22-23, 24, 26). These obligations may have even required Defendants to interview the children in the household at various times during the foster care placement and adoption processes. (Id.) These visits, along with other encounters, raise disconcerting questions about DYFS' involvement in child placement cases in New Jersey.
DYFS received a phone call in September 1992 reporting that a foster child in the Jackson home had complained he was hungry. (OCA Rpt. at 10.) The caller reported that the child had only gained one-half of one pound in weight and not grown in height since being placed there. (Id.) DYFS investigated the incident but did not reach any conclusions about neglect or abuse. (Id.) Notwithstanding the patent problems with B.J.'s placement, Plaintiffs were each placed as foster children in the Jackson home in 1995: T.J. was placed in March, M.J. was placed in August, and, K.J. was placed in November of 1995.
A. Plaintiffs' Placements in the Jackson Home.
T.J. was placed in the Jackson household on March 8, 1995 at seventeen months of age. At the time, he weighed twenty-eight pounds and was roughly two feet seven inches tall. (Compl. at ¶ 37; OCA Rpt. at 15.)
Two months after T.J. was placed, in May 1995, DYFS received a report from B.J.'s school expressing concern because he had failed to gain weight and because Mrs. Jackson had delayed his doctor's appointments. (OCA Rpt. at 10 and 15.) *735 According to the OCA Report the caller reported that B.J. complained the "Jacksons did not give him enough to eat." (OCA Rpt. at 15.) The DYFS investigator noted that B.J.'s foster mother stated that B.J. had a stomach problem, requiring control of his diet. B.J. remained in the Jackson home, but did not return to school the following September. (OCA Rpt. at 11.)
Other reports on B.J. were received by DYFS. A caseworker reported that B.J. had begged her to take him out to eat. (OCA Rpt. at 11.) At another time, a therapist noted that B.J. disclosed that he had been climbing out of a second story window to eat from garbage cans. (Id.) Finally, between 1994 and 1996, caseworkers reported in writing on four separate occasions that B.J. appeared thin or underweight. (Id.)
Defendants placed M.J. in the Jackson home in August of 1995. (Compl. at ¶ 44.) He was seventeen months old, weighed seventeen pounds eight ounces, and was twenty-nine inches long. (Compl. at ¶ 44; OCA Rpt. at 18.)
T.J.'s medical records reveal his abnormal lack of growth and development. By August 25, 1995, just six months after T.J. was first placed in the Jackson home, he had lost four pounds of weight. (OCA Rpt. at 15.) Approximately six weeks later, DYFS reports reflected that he had lost another pound and weighed only twenty-three pounds. (Id.) Almost exactly one year later, on October 15, 1996, T.J.'s pre-adoption examination occurred. (Id.) He was three years of age and weighed twenty-one pounds.
K.J. had been in three foster homes before he joined T.J. and M.J. in the Jackson home on November 2, 1995. (OCA Rpt. at 14.) Prior to this placement, a supervisor had recommended that K.J. be placed in a home with fewer children where he could get more individual attention. (Id.) Instead, K.J. was placed in the Jackson home along with eight other children. (Id.)
When K.J. was placed in the Jackson home, he was seven years of age, weighed thirty-eight pounds and stood three feet nine inches tall. (Id.) Eight months after being placed in the Jackson home, on June 4, 1996, K.J. had a pre-adoptive medical examination. (Id.) K.J.'s weight was recorded as forty-one pounds and his height was forty-four inches. (Id.)
In spite of Plaintiffs' numerous growth and nutrition problems, B.J.'s adoption was finalized on July 8, 1996. (OCA. Rpt. at 12.) Thereafter, a monthly adoptive subsidy was paid to his adoptive parents on his behalf. (Id.) Upon B.J.'s adoption, a DYFS report noted that the foster parents had installed an alarm system which denied him access to the kitchen. (Compl. at ¶ 63.)
K.J. had another medical exam on September 10, 1996. (OCA Rpt. at 14.) In the three months since his June exam K.J. had lost three pounds. (Id.) The medical records list his weight as thirty-eight pounds and his height as forty-five inches. (Id.)
With DYFS' approval, both M.J.'s and K.J.'s adoption were finalized on March 14, 1997. (OCA Rpt. at 15.) Similarly, T.J.'s adoption was finalized on December 12, 1997. (OCA Rpt. at 17). At the time of T.J.'s adoption DYFS reports indicate that he generally enjoyed good health without mentioning T.J.'s low weight and height. (Id.)
B. Defendants' Documentation of Plaintiffs' Medical and Nutritional Problems.
The OCA Preliminary Report charges DYFS with a "systemic" failure to comply *736 with its statutory and regulatory duties as well as its own policies. (OCA Rpt. at 3). DYFS has a minimum visitation requirement ("MVR") for each child placed outside the home which specifies the frequency for which caseworkers must visit the child. (OCA Rpt. at 30.) The MVR schedules normally set visits in a range from once per week to once every twelve weeks. (Id.) In January 2003, the policy for MVRs changed to requiring visits at least once per month. (Id.) Therefore, DYFS caseworkers had many opportunities to see the conditions of the household during the years they were placed there.
In addition, DYFS regulations between 1991 and 1999 required "updated medicals and in-person interviews during re-evaluations" of a household for additional surrogate placements. (OCA Rpt. at 27.) To that end, at least four DYFS employees evaluated the Plaintiffs' foster and adoptive home between 1991 and 2002. (Id.) DYFS supervisors reviewed and approved of at least two of these employees' work. (Id.)
Nonetheless, according to DYFS records, none of the employees responsible for the Jackson home obtained medical records or interviewed all members of the household during any reevaluation. (Id.) Specifically, in September 19, 1997 a DYFS employee conducted a reevaluation of the household. The employee reported that no members of the household had any medical problems requiring treatment. (Id.) The medical history gathered by the OCA contradicts this. In particular, the medical evaluations occurring before the children were adopted in 1997 document specific medical concerns for each child.
For example, a physician evaluating K.J. in September 1996 described him as "underdeveloped" and suggested possible diagnoses of fetal alcohol syndrome and failure-to-thrive syndrome. (OCA Rpt. at 14.) One month later, in October 1996, a pediatric neurodevelopmentalist observed that T.J. was "markedly underweight and undersized and presented with failure-to-thrive syndrome." (Id. at 16.) Likewise, in August 1996 a physician noted that M.J. presented with significant failure-to-thrive syndrome and possible fetal alcohol syndrome. (OCA Rpt. at 19.) In a similar manner, the recorded notes of B.J.'s caseworker described B.J. as "thin" or "underweight" on four occasions between December 22, 1994 and March 27, 1996. (Id.) Thus, one year before the DYFS employee asserted that no one in the home required medical treatment, and before any of the Plaintiffs were adopted, DYFS records document concerns for the boys' health.
Like DYFS, DHS reevaluated and approved the home for foster care in 1999 and 2002. (Compl. at ¶ 107.) Caseworkers also visited the home and saw Plaintiffs a number of times after their adoption in 1997. (Compl. at ¶¶ 105-106.)
C. Plaintiffs' Improvement upon Removal from the Surrogate Home.
When removed from his adoptive home, Plaintiff T.J. was ten years old and weighed twenty-eight pounds. (Compl. at ¶ 4; OCA Rpt. at 15.) From the time T.J. was less than one and a half years old through his tenth birthday, he gained no weight and had grown only seven inches. (OCA Rpt. at 15.) Likewise, when Plaintiff M.J. was removed, he was nine years old and weighed twenty-two pounds. (Compl. at ¶ 4.) He had gained only four pounds, eight ounces in over seven years. K.J. also hardly developed while in the Jackson home. K.J. was fourteen years old, weighed forty pounds, and stood four feet tall when removed from his adoptive home. (Compl. at ¶ 4.) He gained two pounds and three inches in seven years *737 while under the Jackson's care and the supervision of DYFS and DHS.
After their removal from the Jackson home in October 2003 K.J., T.J. and M.J. were placed on a normal diet and given vitamins. (OCA Rpt. at 12, 15, 18). Less than four months later each boy had gained a substantial amount of weight and grown considerably taller. K.J. gained thirty-three pounds and grew one and three quarter inches. (OCA Rpt. at 12). Similarly, T.J. grew three inches and gained fifteen pounds. (OCA Rpt. at 15). M.J. grew more than four inches and gained over twenty pounds. (OCA Rpt. at 18). In each case, doctors concluded that the child's low weight and height were not caused by any medical conditions. (OCA Rpt. at 12, 15 and 18.)
D. Procedural History.
Plaintiffs filed a Complaint on May 26, 2004 in the Superior Court of New Jersey, Law Division, Camden County. On July 23, 2004, a notice of removal was filed by Defendants and the action was removed to the United States District Court of the District of New Jersey.
Before removal on June 17, 2004, the New Jersey Superior Court appointed a guardian ad litem for the Minor Children. The Court appointed guardian was in response to a petition filed by the Child Advocate of the State of New Jersey for the OCA pursuant to N.J. STAT. ANN. § 52:17D-7. Defendants challenged the Superior Court's appointment of a guardian ad litem, by filing a Motion to Vacate which was later withdrawn by Stipulation on September 24, 2004.
Fourteen Causes of Action[5] are alleged in the Complaint and Defendants seek to dismiss all of the claims against them. In the first three Counts, Plaintiffs allege violations of their federal constitutional due process rights. Plaintiffs seek to hold the individual defendants liable under Section 1983 for violations of their federal due process rights. 42 U.S.C. § 1983 (1988) ("Section 1983"). Counts Four and Five allege violations of substantive due process under the New Jersey Constitution against all Defendants. Counts Six through Ten allege violations of Plaintiffs' rights as established by the New Jersey Child Placement Bill of Rights Act, seeking damages against all Defendants. Count Eleven seeks damages for negligence under the New Jersey Torts Claim Act ("TCA") against all Defendants. Counts Twelve and Thirteen seek damages for the violation of the New Jersey Law Against Discrimination ("LAD") against all Defendants. N.J. STAT. ANN. §§ 10:5-1 through 10:5-49 (2000). The Plaintiffs voluntarily dismissed Count Fourteen.
II. STANDARD FOR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM.
Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." The rule seeks to screen out claims for which there is clearly no remedy, or where the plaintiff has no right to assert. Port Auth. v. Arcadian Corp., 189 F.3d 305, 311-12 (3d Cir.1999).
Under Rule 12(b)(6), a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle *738 him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In the alternative, when amendment can cure the defects in a complaint, the plaintiff should be given an opportunity to amend within a reasonable time period. Shane v. Fauver, 213 F.3d 113, 116 (3d Cir.2000). The issue, therefore, is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). See also Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir.2000).
In considering whether a complaint should be dismissed for failure to state a claim upon which relief can be granted, the court must consider only those facts alleged in the complaint and accept all of the allegations as true, drawing all reasonable inferences in the plaintiff's favor. ALA v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir.1994); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994). Under some circumstances, an authentic document attached to a motion to dismiss may be considered by the court. Pension Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993), cert. denied, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). See also Garlanger v. Verbeke, 223 F.Supp.2d 596, 601 (D.N.J.2002). Legal conclusions offered in the guise of factual allegations, however, are given no presumption of truthfulness. See, e.g., Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). See also Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993).
III. ANALYSIS OF STATE DEFENDANTS' MOTION TO DISMISS.
The Motion to Dismiss seeks to dismiss all claims against the State Defendants, which encompasses DYFS, DHS, the State of New Jersey, and the present and former directors of DYFS who have been named.
A. Section 1983 Violations of Federal Constitutional Due Process. (Counts One through Three).
The State Defendants suggest that each of the Section 1983 Counts do not state a sufficient liberty interest which is redressable under federal due process. Defendants also argue that the named officials cannot be held liable under Section 1983 for their actions.[6] The court disagrees.
In cases where the official conduct alleged is sufficiently egregious, the arbitrary actions of an official may support a claim under Section 1983 for a violation of due process. Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). See also Rivas v. Passaic, 365 F.3d 181, 195 (3d Cir.2004). Before evaluating a Section 1983 claim, a court must identify "whether the plaintiff has alleged a deprivation of a constitutional right at all." Lewis, 523 U.S. at 841, 118 S.Ct. 1708. See also Coleman v. DYFS, 246 F.Supp.2d 384, 388 (D.N.J.2003).
Next, Plaintiffs were placed into surrogate care by the State which impinged upon their liberty interests. In general the government has no affirmative duty under the Constitution to take action to assure that each citizen is able to exercise, enjoy or realize the benefits of a particular right. DeShaney v. Winnebago Co. Dept. of Soc. Servs., 489 U.S. 189, 195, *739 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).[7] With respect to the right to liberty, exceptions to the DeShaney rule exist when the government has placed sufficient restraints on a person's liberty to create a special relationship with the individual. At this point a substantive due process right arises out of the affirmative duties created by that special relationship.
The Third Circuit has held that a state's intervention under the surrogate care system sufficiently imposes upon a child's liberty interest to provide a substantive due process right. Nicini v. Morra, 212 F.3d 798, 808 (3d Cir.2000) (holding "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties.") Accord Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987) (en banc). Accordingly, the breach of a state's affirmative duties can provide for liability under Section 1983. Nicini, 212 F.3d at 808 ("The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under Section 1983.") Cf. D.R. v. Middle Bucks Area Voc. Tech. School, 972 F.2d 1364, 1369 (3d Cir.1992). For the special relationship exception to apply, a court must determine that the plaintiff has alleged a protected interest and a sufficient relationship with the government in order to state a cause of action. Nicini, 212 F.3d at 810.
Another exception to DeShaney arises under conditions of a state-created danger. The Third Circuit has recognized circumstances where this cause of action may lay. Kneipp v. Tedder, 95 F.3d 1199, 1205-09 (3d Cir.1996). In Kneipp, police officers intervened to remove plaintiff's private source of protection, thereby placing her in danger. Id. The Third Circuit determined that their intervention supplied a sufficient encroachment upon plaintiff's liberty interest to implicate a protected right. Id.[8]But see D.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, (3d Cir.1992) (finding that "the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs.") The court finds that the Plaintiffs have properly alleged their substantive due process claims under Section 1983 to permit Counts One and Two to remain in the action.
The Plaintiffs also allege that the State provided insufficient process before the deprivation of their liberty interest and insufficient remedies for the deprivation. To state a claim for a deprivation of liberty, the Supreme Court requires allegations of either predeprivation process or a postdeprivation remedy. Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).
Defendants further assert that the conduct alleged does not support a procedural due process right. Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (holding that procedural due process affords protection only against deliberate acts by the government). The Third Circuit has permitted a cause of action based upon conduct which *740 alleges gross negligence. Ryan v. Burlington Co., 674 F.Supp. 464 (D.N.J.1987), aff'd, 860 F.2d 1199 (3d Cir.1988). Cf. McClary v. O'Hare, 786 F.2d 83 (2d Cir.1986) (requiring an allegation of reckless conduct to find a cause stated). Plaintiffs have alleged the deprivation and gross negligence required to support the cause of action alleged in Count Three.
Finally, Plaintiffs alternatively requested remedies under Section 1983 based upon rights arising under New Jersey legislation. State law does not give rise to a right enforceable under federal law. The Supreme Court established that Section 1983 provides a cause of action for violations of rights arising under federal legislative provisions. Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).[9]See also Benn v. Universal Health Sys., 371 F.3d 165, 174 (3d Cir.2004).
1. Fictitious Names.
Defendants also argue that the claims alleged under Section 1983 should be dismissed because they are made against persons who have not yet been named. These claims shall remain a part of this action.
Courts will allow claims based upon "fictitious" defendants because they may be found and named later through the discovery process. Alston v. Parker, 363 F.3d 229, 233 n. 6 (3d Cir.2004) (citing Hindes v. FDIC, 137 F.3d 148, 155 (3d Cir.1998)). See also Scheetz v. Morning Call, Inc., 130 F.R.D. 34, 36 (E.D.Pa.1990), aff'd, 946 F.2d 202 (3d Cir.1991) (stating that fictitious defendants are permitted "as stand-ins for real parties until discovery permits the intended defendants to be installed.") In such cases, courts allow claims for relief to survive a motion to dismiss.
Plaintiffs have sufficiently alleged claims under Section 1983 as to be entitled to present evidence in support of Counts One through Three.
The court now turns to the claims alleging violations of Plaintiffs' rights under New Jersey law. Plaintiffs seek remedies in damages pursuant to the New Jersey legislative provisions which they suggest contain implied remedies.
B. Implying Remedies under New Jersey Legislative Provisions.
New Jersey utilizes the Restatement rule for determining when a legislative provision should be read as containing an implied remedy. Bortz v. Rammel, 151 N.J.Super. 312, 321, 376 A.2d 1261 (App.Div.), certif. denied, 75 N.J. 539, 384 A.2d 518 (1977). For those statutes which omit any reference to remedies, the Restatement allows for a civil remedy to be implied. RESTATEMENT (SECOND) OF TORTS § 874A (1979). The Restatement proposes:
[w]hen a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action....
RESTATEMENT (SECOND) OF TORTS § 874A (1979). The comments to the Restatement further explain that this rule applies to *741 statutory as well as constitutional provisions.[10]
When inferring a private right of action, the central inquiry, therefore, seeks to determine whether the legislature intended to provide a civil remedy under the statute. See, e.g., Jalowiecki v. Leuc, 182 N.J.Super. 22, 30, 440 A.2d 21 (1981). In order to make this determination, New Jersey courts examine: (1) whether plaintiff is a member of the class for whose benefit the statute was enacted; (2) evidence that the legislature intended to create a private right of action under the statute; and (3) whether inferring a remedy would be consistent with the underlying purpose of the legislative scheme. Castro v. NYT Television, 370 N.J.Super. 282, 291, 851 A.2d 88 (2004) (citing R.J. Gaydos Ins. Agency v. Nat'l Consumer Ins. Co., 168 N.J. 255, 271, 773 A.2d 1132 (2001)). These guidelines will be considered for implying remedies under the New Jersey legislative provisions as requested by Plaintiffs.
1. New Jersey Child Placement Bill of Rights Act (Count Six).
The parties disagree as to whether the Child Placement Bill of Rights Act (the "Act" or the "Child Placement Bill of Rights Act") provides a private cause of action in damages. N.J. STAT. ANN. 9:6B-1 to 9:6B-6 (1991). Defendants contend that Castro effectively forecloses a remedy under the Act. Castro is distinguishable from the instant action and not dispositive of the question. As discussed, when implying a remedy pursuant to a legislative provision, the New Jersey courts seek to determine whether the legislature intended to provide a civil remedy under the statute. The inquiry here centers around whether that remedy would be consistent with the underlying purpose of the legislative scheme.
First, the overall scheme of the New Jersey child welfare statutes will be considered as a factor in the determination of the underlying purpose of the Child Placement Bill of Rights Act. The Act outlines the State's responsibilities when undertaking to protect children by placing them outside of the home. N.J. STAT. ANN. 9:6B-1 to 9:6B-6. The main provisions of the New Jersey child welfare laws contain the specific requirements and regulations for the administrative oversight of the child placement process. However, the legislature created the Child Placement Bill of Rights Act as separate from the body of the child welfare laws, suggesting that it was meant to provide a separate remedy.
Title 30 and Title 9 contain the body of the New Jersey child welfare laws. Each title contains provisions for separate proceedings with respect to a child's placement outside of the home. Chapter 4C of Title 30 encompasses the primary termination of parental rights provisions enacted as the Child Placement Review Act (N.J. STAT. ANN. §§ 30:4C-50 to 30:4C-65) and the Child Placement Act (N.J. STAT. ANN. §§ 30:4C-1 to 30:4C-83). Both Chapters under Title 30 prescribe specific procedures with respect to placing children outside the home.
Title 9, on the other hand, contains the provisions for temporary placement in cases of abuse or neglect. N.J. STAT. ANN. §§ 9:6-1 to 9:6-8.106. Under that title, the definition for abused or neglected child provides that either action or inaction by *742 the parent may constitute grounds to find abuse or neglect. Id. A finding of abuse or neglect allows the state agency to file a complaint seeking to terminate parental rights under Title 30. N.J. STAT. ANN. § 9:2-18. Each of the New Jersey child welfare acts also requires a different burden of proof and provides for separate remedial schemes. N.J. STAT. ANN. § 9:6-8.46 (requiring a preponderance of the evidence for a finding of abuse or neglect). See also In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992) (requiring a higher standard of clear and convincing evidence for termination of parental rights under Title 30).
It appears that the New Jersey legislature designed the Child Placement Bill of Rights Act to protect the most fundamental rights of children placed outside the home. The Act's section on legislative findings and declarations outlines three basic principles. N.J. STAT. ANN. § 9:6B-2. These principles guide the court's interpretation of the Act. First, the legislature states that children placed outside of the home hold and enjoy rights independent of their parent or legal guardian. N.J. Stat. Ann. § 9:6B-2 (a). Second, the legislature recognizes an affirmative obligation of the State to recognize and protect the rights of the child placed into surrogate care. N.J. STAT. ANN. § 9:6B-2 (b). Third, the legislature included a requirement for a clear and consistent policy from the State for the promotion of permanent placement over long-term temporary care. N.J. STAT. ANN. § 9:6B-2 (c).
The Act directs further that surrogate placement must be carried out in a manner "consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development...." N.J. STAT. ANN. § 9:6B-4. This section enumerates sixteen discrete guidelines for the State to follow in order to protect the rights of children who receive surrogate placement. These guidelines specify that when placing children outside of the home, the State must take all reasonable measures to protect their safety, right to contact with siblings, interest in receiving permanent placement over continuous foster care, and fundamental rights to adequate food, clothing, housing and medical care.
One of the fundamental principles of statutory construction, "ubi ius ibi remedium" proclaims that rights created by legislation arise from an intention to confer an adequate remedy to enforce those rights. RESTATEMENT (SECOND) OF TORTS § 874A cmt. c (1979). Furthermore, a statutory construction which renders any portion of a statute superfluous should be avoided. See, e.g., Abbotts Dairies v. Armstrong, 14 N.J. 319, 327-28, 102 A.2d 372 (1954). Under certain circumstances, a violation of a statute may generate a remedy which is not explicitly stated in the act. Parks v. Pep Boys, 282 N.J.Super. 1, 14, 659 A.2d 471 (1995). Consistent with the rules of statutory construction, the court finds that the intent of the legislature was to provide an effective remedy for the violation of the rights enumerated by the Child Placement Bill of Rights Act.
The statutory construction found in Castro regarding the underlying legislative purpose of the Hospital Patients' Bill of Rights Act found is distinguishable from the instant case. Castro v. NYT Television, 370 N.J.Super. 282, 851 A.2d 88 (2004). In Castro, the court was asked to imply a private right of action pursuant to the Hospital Patients' Bill of Rights Act. N.J. STAT. ANN. § 26:2H-12.10. That Act enumerates seventeen rights of hospital patients while explicitly providing a single remedy for the violation of those rights: patients may complain to the Department *743 of Health which closely regulates the hospital industry. Castro, 370 N.J.Super. at 290, 851 A.2d 88. Under that Act, "a patient who claims a hospital has violated one of the rights found in the Act `may file a written complaint against a hospital for failure to comply with the provisions of this act'" with the Department of Health. Castro, 370 N.J.Super. at 290, 851 A.2d 88 (quoting N.J. STAT. ANN. § 26:2H-12.10).
The legislative history of the Hospital Bill of Rights Act also shows that the legislature considered and removed language which might have provided for a private cause of action under it. Castro, 370 N.J.Super. at 292, 851 A.2d 88 ("This legislative history demonstrates that the Legislature made a deliberate decision to withhold authorization for patients to bring private actions for alleged violations of the Hospital Patients Bill of Rights Act.") The court determined that the legislature's inclusion of a sufficient and explicit remedy in the Hospital Patients' Bill of Rights Act precluded finding that the statute contained a separate private right of action for violations of its provisions. Castro, 370 N.J.Super. at 289-91, 851 A.2d 88.
In contrast, no remedies or remedial scheme were provided within the Child Placement Bill of Rights Act. The Act enumerates the rights of children who are placed in surrogate care by the State, without articulating the remedy for a violation of those rights. N.J. STAT. ANN. 9:B6-4 (stating that "a child placed outside his home shall have the following rights....") Under these circumstances, the court must determine how the legislature intended for the provisions of the Child Placement Bill of Rights Act to be enforced in order to uphold its underlying purpose in the legislative scheme. Having found that the underlying purpose of the statutory scheme suggests a remedy for the Child Placement Bill of Rights Act, the New Jersey case law interpreting the child welfare laws will also be considered.
Under New Jersey law, the termination of parental rights is a serious matter. When a minor child needs to be protected from serious physical or emotional harm, the State may step in as parens patriae where "[i]n some instances, this may require a partial or complete severance of the parent-child relationship." In Matter of the Adoption of A Child By P.S. and J.S., 315 N.J.Super. 91, 716 A.2d 1171 (1998) (citation omitted ).[11] The decision must be based upon a determination of whether placement action would be in the child's best interest. N.J. STAT. ANN. §§ 30:4C-15.1 to 30:4C-20. Termination of parental rights will not be permitted under circumstances where a child "might be better off" with prospective foster or adoptive parents. In re Guardianship of J.C., 129 N.J. 1, 19, 608 A.2d 1312 (1992). In those cases where parental rights are terminated, DYFS obtains full authority over a child. See, e.g., In re Guardianship of R.O.M.C., 243 N.J.Super. 631, 581 A.2d 113 (App.Div.1990).
Because DYFS takes full authority over a minor child and assumes the role of parens patriae during the placement process, public policy requires that it have an enhanced duty with respect to the children it undertakes to protect. Accordingly, the legislature enacted a bill of rights which articulates this affirmative duty of the State to enforce the rights of children who receive surrogate placement. See, e.g., N.J. STAT. ANN. § 9:6B-2 (declaring, in part, that the "State has an affirmative *744 obligation to... enforce these rights in order to protect and promote the welfare of the child placed outside his home....") The Act recognizes a basic principle that it is the obligation of our society to protect children as members of a vulnerable class of persons.
In addition, the New Jersey courts have upheld the provisions protecting the rights of children under the Child Placement Bill of Rights Act. For example, paragraphs e and f address the specific need for siblings to maintain their sibling relationships when placed into a surrogate home. N.J. STAT. ANN. § 9:6B-4 (e) & (f). The Appellate Division of the New Jersey Superior court enforced these siblings rights provisions as found under the Act. In the Matter of C.R., 364 N.J.Super. 263, 278, 835 A.2d 340 (2003). In that case, the court found that the review by the Chancery Division of the specific proposed placement includes the right of the child to consideration of sibling relationships as a part of the totality of the circumstances for making the "best interests" determination. C.R., 835 A.2d at 349.
Next, New Jersey courts have recognized that the underlying purposes of the Act include protection of the child's interest in permanent placement. Guardianship of D.J.M., 325 N.J.Super. 150, 737 A.2d 1179 (1999) (citing N.J. DYFS v. K.M., 136 N.J. 546, 559, 643 A.2d 987 (1994); N.J. STAT. ANN. §§ 9:6B-1 to 9:6B-6). See also Guardianship of K.H.O., 308 N.J.Super. 432, 442, 706 A.2d 226 (1998) (stating that children in foster care are entitled to contact with siblings and foster parents under the Child Placement Bill of Rights Act). Cf. In re E.M.B., 348 N.J.Super. 31, 791 A.2d 256 (2002) (citing N.J. STAT. ANN. § 30:4C-50) (finding that the intent of the Child Placement Review Act is to provide periodic review of each child in placement in order to establish either permanent placement or return home). In D.J.M., the Chancery Division also discusses the purpose behind the later enactment of the New Jersey Adoption and Safe Families Act (the "A.S.F.A.") in order to advance the legislature's intent to place the safety of children first in guardianship proceedings. D.J.M., 325 N.J.Super at 155, 737 A.2d 1179 (citing SEN. JUDICIARY COMM. STMT. TO SENATE BILL NO. 1705 (1999)) ("[T]he safety of children shall be the paramount concern, expanding the current State policy which protects a child's best interests.") The A.S.F.A. further illustrates the Legislature's continuing commitment to making a child's safety the utmost priority when the State intervenes to place children outside of the home.
Finally, the New Jersey Supreme Court has recognized the special status of children, stating that they are members of "a vulnerable class by virtue of their age and immaturity." Frugis v. Bracigliano, 177 N.J. 250, 282, 827 A.2d 1040 (2003). In Frugis, the Board of Education ignored indications that a school official was abusing students and failed to institute policies that may have protected the students. As a result, the state Supreme Court concluded that "[a]lthough the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care." Id. at 268, 827 A.2d 1040. In the instant action, the overarching mission of the State government is to protect children from harm. The State does so by intervening on their behalf in situations of abuse and neglect, as prescribed under its laws.
Any construction of the Child Placement Bill of Rights Act which does not provide a private right of action would work against the principals of statutory construction and would work against the basic policy decisions underlying the enactment of the legislation. The court can imagine no permissible *745 reading of the Act which would not provide a private remedy for the violation of certain rights of a child being placed outside of the home to adequate food, shelter and medical care, and the right to a reasonably safe environment.
The foster care plan that satisfies all of the specific provisions found under New Jersey law will be as individual as each child. Without specific guidance, there is no adequate measure of what the individual needs of a child in surrogate care should be. The Child Placement Bill of Rights Act does not seek to provide for administration over the child placement process because those particulars are left to the devices of the child placement system. See, e.g., N.J. STAT. ANN. §§ 30:4C-50 to 30:4C-65; N.J. STAT. ANN. §§ 30:4C-1 to 30:4C-83; N.J. STAT. ANN. §§ 9:6-1 to 9:6-8.106. Instead, the Child Placement Bill of Rights Act seeks to remedy the harm which arises when the State agencies and the placement system fail to carry out the State's affirmative obligation to protect the fundamental rights of the children entrusted to its care.
Under the circumstances found here, it is the duty of the court to provide those remedies which are necessary to make effective the New Jersey legislature's purpose for enacting the Child Placement Bill of Rights Act. An administrative review process does not provide the type of review desirable for a resolution of the issue as to whether a child's fundamental rights have been protected by the State's placement process. Though a court should refrain from legislating or administrating from the bench, the basic adequacy of the oversight provided by the State and its agencies may be addressed. Private enforcement provides the necessary power behind the legislation where the possibility of civil damages serves as the most effective enforcement mechanism for the Act's goal to insure that the agencies responsible for the child's welfare uphold the rights of the child. It is proper and necessary, therefore, that the Child Placement Bill of Rights Act provide a private right of action.
2. New Jersey Constitution. (Counts Four and Five).
The New Jersey Constitution contains neither the term "due process" nor the phrase "equal protection." However, when a statute is challenged under the State Constitution, the New Jersey Supreme Court has construed it expansively. Caviglia v. Royal Tours of Am., 178 N.J. 460, 472, 842 A.2d 125 (2004). For thirty years, Article I, paragraph 1 of the State Constitution has been interpreted as guaranteeing the fundamental rights of life, liberty, and property. Id.See also Montville v. Block 69, 74 N.J. 1, 21, 376 A.2d 909 (1977) ("In fact, we have at times interpreted our State Constitution to provide greater protections than those existing under analogous Federal provisions.") For due process challenges to statutory provisions, the New Jersey Supreme Court employs the analysis utilized by the federal courts. State Farm Mut. Auto. Ins. v. State, 124 N.J. 32, 46-47, 590 A.2d 191 (1991) (stating with respect to a challenge to the facial constitutionality of the New Jersey Fair Automobile Insurance Reform Act that "[t]his court has chosen to apply the same standards developed by the United States Supreme Court under the federal Constitution for resolving due process claims under the New Jersey Constitution.") See also Roman Check Cashing, Inc. v. N.J. Dep't of Banking and Ins., 169 N.J. 105, 110, 777 A.2d 1 (2001) (applying the due process analysis utilized by federal courts in an action challenging a distance requirement contained within the New Jersey Check Cashers Regulatory Act).
*746 The question here is whether a private right of action for damages exists under the State Constitution for a violation of an individual's due process rights by the State government. Therefore, the court must determine whether inferring a remedy for a violation of individual rights under State due process would be consistent with the underlying purpose of the constitutional and statutory scheme.
Few cases directly address implying a private right of action for a due process violation of an individual's rights under the New Jersey Constitution. In one instance, the New Jersey court held that there is no special relationship exception available under the New Jersey Tort Claims Act. Macaluso v. Knowles, 341 N.J.Super. 112, 775 A.2d 108 (2001) (declining to extend a right of action for a violation of a child's rights by the State in the school environment).[12] In another case, the New Jersey court declined to extend liability for damages based upon a state-created danger theory. Gonzales v. Camden, 357 N.J.Super. 339, 815 A.2d 489 (2003). In this case, two shop owners were shot when closing their store late at night after city inspectors delayed them with an inspection. The plaintiffs contended that the city inspectors, some of whom were armed, should have waited and escorted them after closing of the store. Id. The court declined to imply a due process right of action because no affirmative duty existed for the city officials to protect the shop owners.
Those cases permitting a private right of action for a violation of an individual's rights under the New Jersey Constitution appear to be limited to employment discrimination under equal protection. See, e.g., Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 389 A.2d 465 (1978). Cf. Cooper v. Nutley Sun Printing Co., 36 N.J. 189, 175 A.2d 639 (1961) (providing an equitable remedy). In these cases, the New Jersey courts permit an implied private right of action for violations of individual rights under State due process. It is not clear whether the New Jersey Supreme Court would also infer a private cause of action against the State government.
A bill was sponsored in 2002 to close the gaps in state law by providing remedies for violations of an individual's state and federal constitutional rights. A-2073/S-1558 (N.J.2002). Modeled after Section 1983, the final Act was passed in September of 2004. New Jersey Civil Rights Act, N.J. Stat. Ann. §§ 10:6-1 and 10:6-2 (2004).
However, this civil rights act does not include a right of action for private parties. Instead, it creates a civil claim for deprivations of an individual's "substantive rights, privileges or immunities" secured by the State Constitution or laws, enforceable by the State Attorney General.[13] N.J. STAT. ANN. § 10:6-2 (stating "the Attorney General may bring a civil action for damages and for injunctive or other appropriate relief.... If the Attorney General proceeds with and prevails in an action brought pursuant to this subsection, the court shall order the distribution of any award of damages to the injured party and shall award reasonable attorney's fees and costs to the Attorney General.")
*747 Sovereign immunity should not apply to violations of a constitutional right, because no branch of government created the constitution. The New Jersey State Constitution was created by the people to govern their government.[14] Furthermore, a state bill of rights will be enacted in order to provide affirmative rights which define the limits of permissible governmental action.
Under federal law, the Due Process Clause places no affirmative duty upon a state to protect its citizens, but it does provide a boundary which will limit a state's power to act. DeShaney v. Winnebago Co. Dept. of Soc. Servs., 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Cf. D.R. v. Middle Bucks Area Voc. Tech. School, 972 F.2d 1364, 1372 (3d Cir.1992); Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459, 465 (3d Cir.1990) (finding mentally retarded adult's liberty not restrained by state where he was not required to remain in facility and "enjoyed considerable freedom of movement.") The Third Circuit has determined that the state's intervention under the surrogate care system provides one situation from which certain basic duties flow. Nicini v. Morra, 212 F.3d 798, 808 (3d Cir.2000) (holding "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties.")[15] The New Jersey legislature agreed when it placed an affirmative duty on the State by statute. Child Placement Bill of Rights Act, N.J. STAT. ANN. 9:6B-1 to 9:6B-6 (1991).
As discussed in this opinion, the New Jersey Tort Claims Act and the Child Placement Bill of Rights Act both provide remedies against the State. Thirty years ago, the legislature opened the State to suit under a tort claims act. In response to inaction under the State laws, the legislature provided a specific bill of rights act to address the rights of children within the State surrogate care system. Recently, the legislature enacted a civil rights act to provide additional remedies under the New Jersey Constitution.
Because these remedies are available, it is not likely under the legislative scheme that an additional remedy may be inferred under the New Jersey Constitution for the circumstances of this case. The court must conclude that insufficient justification has been offered to provide the requested remedy against the State government at this time. Counts Four and Five are dismissed.
3. Other State Statutes (Counts Seven through Ten).
Plaintiffs' Counts Seven, Eight, Nine and Ten each seeks damages for alleged *748 breaches of statutory and regulatory provisions under New Jersey statutes. (Compl. ¶ 173; Compl. ¶ 178; Compl. ¶ 182; Compl. ¶ 185-191.) These statutory provisions do not explicitly nor independently provide remedies. The court declines to find that any private right of action can be implied within any of these statutes. Instead, a breach of a statutory provision may provide evidence of a duty in a negligence action. Because these counts do not articulate separate causes of action from the Count alleged under the Tort Claims Act, below, they shall be dismissed.
C. Negligence under the New Jersey Tort Claims Act. (Count Eleven).
New Jersey law supplies duties to its governmental agencies for the protection of children when administering child placement programs. N.J. STAT. ANN. §§ 9:6B-1 to 9:6B-6; §§ 30:4C-50 to 30:4C-65; §§ 30:4C-1 to 30:4C-83. See also Frugis v. Bracigliano, 177 N.J. 250, 282, 827 A.2d 1040 (2003) (remanding and directing that the jury should be instructed on the heightened duty of school boards to ensure students' safety from foreseeable harms). Plaintiffs allege that the public employees charged with overseeing these programs breached this duty and caused them harm. Plaintiffs have properly stated claims for negligence which fall within the waiver of sovereign immunity provided by the TCA. N.J. Stat. Ann. 59:1-2 (1972).
Defendants contend, however, that specific immunities under the TCA operate to shield them from all liability under this Count. The immunities claimed do not apply to the actions of the public employees who were alleged to have caused the harm here.
1. Licensing Immunity under the TCA.
Defendants attempt to claim that their responsibilities merely amounted to providing a license for foster care and adoptions. Ball v. N.J. Telephone Co., 207 N.J.Super. 100, 504 A.2d 29 (1986) (determining that the government cannot evade liability for its own conduct which created a dangerous condition on its property merely because it also provided a license for placement of a telephone pole). This immunity for licensing activities is a narrow exception to the waiver of sovereign immunity under the TCA. N.J. STAT. ANN. § 59:2-5 (1992). The protected licensing functions only include those activities directly related to the issuance or denial of a license application. Ball states that "the immunity accorded by the statute was intended to protect public bodies in the performance of their discretionary and ministerial licensing functions." Id. at 110, 504 A.2d 29. The agency activities and oversight alleged in this action fall outside of the exception.
The activities alleged here far exceed the scope of merely providing a license to a foster parent or adoptive parent. Plaintiffs are entitled to present evidence arising from the Defendants' activities seeking to protect the welfare of the Plaintiffs during the surrogate placement process.
2. Immunity for Enforcement of the Law under the TCA.
Defendants claim that there is no waiver of sovereign immunity as to actions taken by them as an enforcer of the law. Plaintiffs have alleged claims for a failure by the agency to fulfill its duties in oversight over the child placement process. The claims do not seek damages for the failure of any agency to enforce regulations or to provide law enforcement. See, e.g., Saldana v. DiMedio, 275 N.J.Super. 488, 646 A.2d 522 (1994) (distinguishing between negligence claims and claims against the government serving in its "role *749 as enforcer of the laws.") Instead, the activities alleged fall outside the scope of the limited exception to New Jersey's waiver of sovereign immunity for enforcement of the law. N.J. STAT. ANN. § 59:2-4 (1992). See also Cadmus v. Long Branch Bd. of Ed., 155 N.J.Super. 42, 382 A.2d 98 (1977). Plaintiffs are entitled to present evidence arising from the Defendants oversight of the surrogate placement process which falls outside the scope of the state's immunity for law enforcement activities.
3. Judicial Immunity under the TCA.
The Defendants attempt to immunize all of their actions by suggesting that the judicial removal proceeding resulted in the entire cause of action. The argument ignores that the complaints against the Defendants arise from conduct which extends beyond their participation in any judicial removal proceedings. See, e.g., Delbridge v. Schaeffer, 238 N.J.Super. 323, 569 A.2d 872 (1989) (asserting malicious prosecution claim that the judicial proceeding which resulted in the removal of their children had been unfair).
Caseworkers are entitled to absolute immunity for their actions in preparing for dependency proceedings but that immunity does not extend beyond the actual proceedings. Ernst v. Child and Youth Servs. of Chester Co., 108 F.3d 486, 495 (3d Cir.1997) (holding that caseworkers'"immunity is broad enough to include the formulation and presentation of recommendations to the court in the course of such proceedings."); Miller v. Philadelphia, 174 F.3d 368, 375 (3d Cir.1999) (declining to extend the immunity to investigative or administrative acts). As such, Plaintiffs are entitled to present evidence which falls outside the scope of this narrow exception.
4. Negligence of Private Actors.
Finally, Defendants suggest that they are not responsible for the abuse to the children because the abuse itself was caused by the adoptive parents, who are private actors. Under the circumstances of this case, the argument lacks merit because the negligence of the adoptive parents is not at issue. Though as a general proposition the government is not required to protect individuals against private violence, under certain circumstances, affirmative duties of care will be imposed. Nicini, 212 F.3d at 806. Cf. D.R., 972 F.2d at 1374 (discussing the liability which may arise when a states' affirmative acts work to a plaintiff's detriment by exposing them to danger). Furthermore, State law imposes certain separate affirmative duties in the child placement context on the various state agencies involved in this case. Child Placement Bill of Rights Act, N.J. STAT. ANN. 9:6B-1 to 9:6B-6 (1991). The failures and actions by the state government which breached these affirmative duties support a claim for negligence. Defendants' argument also ignores those actions taken by the state to intervene by placing the Plaintiffs into surrogate care, thereby giving rise to affirmative duties.
D. New Jersey Law Against Discrimination. (Counts Twelve and Thirteen).
The LAD prohibits discrimination against persons on the basis of enumerated categories, which include persons who are handicapped. N.J. STAT. ANN. § 10:5-4.1 (2000). The statutory definition of "handicapped" has been construed broadly to cover more than severe disabilities. See, e.g., Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 593, 538 A.2d 794 (1988); Olson v. Gen'l Elec. Astrospace, 966 F.Supp. 312, 315 (D.N.J.1997). However, the statute only addresses discrimination *750 in three areas of public concern: employment, places of public accommodation, and housing. N.J. STAT. ANN. § 10:5-12 (2000).
Plaintiffs allege that the individual Defendants and state agency discriminated against them on the basis of their status as persons with eating disorders, thereby violating the LAD. These claims do not fall within the areas where discrimination has been prohibited under the statute. Plaintiffs have not alleged that they were denied employment or refused housing by DYFS. Nor is DYFS considered to be a place of public accommodation. Doe v. Div. of Youth & Fam. Services, 148 F.Supp.2d 462, 496 (D.N.J.2001). The definition of a place of public accommodation is not so broad as to include the services provided by a state agency within the meaning of public accommodation. Instead, it refers to facilities maintained for the use of the general public. See, e.g., Nat'l Org. for Women v. Little League Baseball, 127 N.J.Super. 522, 318 A.2d 33 (1974), aff'd, 67 N.J. 320, 338 A.2d 198 (1974).
As a result, Plaintiffs have failed to properly state a claim under the LAD. The claims under Causes of Action numbered Twelve and Thirteen are thereby dismissed.
E. Joint Tortfeasors.
Defendants' final effort to dismiss this action alleges that the adoptive parents are necessary parties to the action and, therefore, they must be joined pursuant to Rule 19. Fed.R.Civ.P. 19. As a matter of law, joint tortfeasors are not indispensable parties. Furthermore, neither the New Jersey apportionment rule nor the case law interpreting it suggest that joint tortfeasors must be named defendants in order for it to apply. N.J. Stat. Ann. § 59:9-3 (limiting contribution by public entities to the extent of the public defendant's percentage share of culpability when joint tortfeasors are available). Cf. Frugis v. Bracigliano, 177 N.J. 250, 827 A.2d 1040 (2003). The District Court of New Jersey has stated "it is never necessary... to join a joint tortfeasor as a defendant in an action against other tortfeasors." Rodin Props.-Shore Mall v. Cushman & Wakefield of Pa., 49 F.Supp.2d 709 (D.N.J.1999) (Brotman, J.) Defendants may implead the Jacksons under Rule 14(a) if they believe it is necessary. FED. R. CIV. PROC. 14(a).
IV. CONCLUSION.
For the foregoing reasons, the court finds that Defendants' Motion to Dismiss is denied with respect to Counts One through Three under Section 1983, Count Six under the New Jersey Child Placement Bill of Rights, and Count Eleven under the New Jersey Tort Claims Act. Plaintiffs' Counts Four and Five under the New Jersey Constitution, Counts Seven through Ten under New Jersey statutes and regulations and Counts Twelve and Thirteen under the Law Against Discrimination are hereby dismissed for failure to state a claim for which relief can be granted. Count Fourteen was voluntarily dismissed by Plaintiffs.

ORDER DENYING DEFENDANTS' MOTION TO DISMISS
THIS MATTER having come before the Court on Defendants State of New Jersey, New Jersey Division of Youth and Family Services, Department of Human Services and individually named directors' of that agency Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Court having reviewed the submissions of the parties and having heard oral argument on the motion; and
*751 IT APPEARING that the first three Counts[1] of Plaintiffs' Complaint properly state claims for damages under Section 1983 which are federal in character;[2]
IT APPEARING that a private right of action against the State is inherent within the New Jersey Child Placement Bill of Rights Act (Count Six);[3]
IT APPEARING that Counts Four, Five, Seven, Eight, Nine and Ten of Plaintiffs' Complaint fail to state a claim because a private right of action for damages is not explicitly available under the New Jersey laws cited;
IT APPEARING that Count Eleven properly states a claim for negligence and the State of New Jersey has waived sovereign immunity as to negligence claims pursuant to the New Jersey Tort Claims Act;[4]
IT APPEARING that Counts Twelve and Thirteen of Plaintiffs' Complaint fail to state a claim under the New Jersey Law Against Discrimination;
IT APPEARING that Count Fourteen of Plaintiffs' Complaint was voluntarily dismissed by Plaintiffs; and
FOR THE REASONS stated in the Opinion of the Court filed on this same date;
NOW THEREFORE, it is on this 6th day of April 2005;
HEREBY ORDERED that Counts Four, Five, Seven, Eight, Nine, Ten, Twelve, Thirteen and Fourteen under Plaintiffs' Complaint shall be dismissed from the action for failure to state a claim; and
FURTHER ORDERED that Defendants' Motion to Dismiss is DENIED as to Counts One through Three, Six, and Eleven under Plaintiffs' Complaint.
NOTES
[1] The New Jersey Office of the Child Advocate (OCA) is an independent government agency created to investigate the State's responses to allegations of child abuse or neglect. After completing its review, the OCA makes recommendations concerning the procedures established by agencies involved in child protective or permanent placement services. In response to the Jackson case, the OCA produced a Preliminary Report that was attached to and incorporated in Plaintiffs' Complaint (the "OCA Rpt.") To write its report, the OCA "analyzed every component of the child welfare system that interacted with the Jackson household between 1991 and October of 2003." (Feb. 12, 2004 OCA Rpt. at 6.) The investigation focused on systemic issues as documented by the written records. (OCA Rpt. at 7.)
[2] In addition, various managerial, supervisory, and caseworker "Does" were listed as unnamed defendants, while the present and former directors of DYFS were listed as defendants as well.
[3] The Complaint incorporates the OCA Preliminary Report and the Court, thereby, accepts the allegations contained within the OCA Report as true for the purposes of determining this motion. See, e.g., Pension Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993), cert denied, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).
[4] DYFS records show that DYFS caseworkers visited the Jackson home at least thirty-eight times between 1999 and 2003 in connection with the proposed adoption of another ten-year-old boy. (OCA Rpt. at 3.)
[5] For reasons that are unclear, Plaintiffs designated each count as a separate "cause of action" in the Complaint. For consistency, this court treats each numbered "Cause of Action" as a "Count" and will refer to them as such.
[6] The parties agree that these counts are alleged against the individual defendants only. (Tr. at 17.)
[7] Cf. G-69 v. Degnan, 745 F.Supp. 254 (D.N.J.1990) (Brotman, J.) ("Since DeShaney, courts have struggled with whether state conduct short of actually taking a person into physical custody is sufficient to create a special relationship such that an affirmative duty is owed.")
[8] See also Freeman v. Ferguson, 911 F.2d 52 (8th Cir.1990) (noting that DeShaney left unclear what level of state conduct would create a constitutional duty to protect); Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).
[9] The Supreme Court has carved out two exceptions to Eleventh Amendment Immunity for when the State consents to being sued or when Congress abrogates immunity through legislation. Cochran v. Pinchak, 401 F.3d 184, 187-88 (3d Cir.2005) (citing Seminole Tribe v. Fla., 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)).
[10] As used in this Section, the term "legislative provision" includes statutes, ordinances and legislative regulations of administrative agencies at various levels of government. It also includes constitutional provisions.

RESTATEMENT (SECOND) OF TORTS § 874A cmt. a (1979).
[11] Accord Johnson v. State, 18 N.J. 422, 430, 114 A.2d 1 (1955) ("Parens patriae jurisdiction is an inherent right of sovereignty and imposes a duty on the sovereignty to protect such persons with disabilities, such as mental infirmity, who have no rightful protector.")
[12] Cf. State in the Interest of R.G.W., 145 N.J.Super. 167, 366 A.2d 1375 (N.J.Juv. & Dom.Rel.1976) (finding a right to treatment where the State acknowledged an affirmative obligation by statute) (citing the Mental Patients' Bill of Rights, N.J. STAT. ANN. 30:4-24.2); In re D.D., 118 N.J.Super. 1, 285 A.2d 283 (1971).
[13] The Attorney General may also bring a civil action for deprivations of an individual's "substantive due process or equal protection rights, privileges, or immunities" secured by the Constitution or laws of the United States. Id.
[14] At a time when the responsiveness of all levels of government is being continuously challenged, it is difficult to continue to support such an arbitrary and unjust doctrine [of sovereign immunity]. It seems even more difficult to believe that the State of New Jersey is willing to provide a crime compensation fund for payments to victims of crime  a victimization over which the State has little effective control  and at the same time continue to refuse to permit itself to be sued when its own conduct and that of its employees has harmed equally innocent third persons.

MAY 1972 N.J. ATT'Y GEN. REP., TASK FORCE ON SOV. IMMUNITY ch. 2, at 7. See also Rochinsky v. State, Dept. of Transp., 110 N.J. 399, 407 n. 3, 541 A.2d 1029 (1988) (concluding that the Task Force Commentary has the precedential value of legislative history). Accord Smith v. Fireworks by Girone, Inc., 180 N.J. 199, 208 n. 2, 850 A.2d 456 (2004).
[15] Compare G-69 v. Degnan, 745 F.Supp. 254 (D.N.J.1990) (Brotman, J.) ("Since DeShaney, courts have struggled with whether state conduct short of actually taking a person into physical custody is sufficient to create a special relationship such that an affirmative duty is owed.")
[1] For reasons that are unclear, Plaintiffs designated each count as a separate "cause of action" in the Complaint. For consistency, this court treats each numbered "Cause of Action" as a "Count" and will refer to them as such.
[2] 42 U.S.C. § 1983 (1988).
[3] N.J. STAT. ANN. 9:6B-1 to 9:6B-6 (1991).
[4] N.J. STAT. ANN. § 59:1-2 (1972).